Argued March 30; affirmed May 11, 1948

# SUNSHINE DAIRY *v.* PETERSON, Director of Department of Agriculture of the State of Oregon, and MULTNOMAH CREAMERY, a Corporation, et al.

193 P. (2d) 543

*Samuel B. Weinstein,* Special Assistant Attorney General, of Portland, argued the cause for defendant-appellant. With him on the brief was George Neuner, Attorney General.

*Nicholas Jaureguy,* of Portland, argued the cause

for respondent. On the brief were Cake, Jaureguy & Tooze, and Jay Bowerman, of Portland.

*R. R. Bullivant,* of Portland, argued the cause for intervenors-appellants. On the brief were Pendergrass, Spackman & Bullivant, of Portland.

Before ROSSMAN, Chief Justice, and LUSK, BELT, KELLY, BAILEY and BRAND, Justices.

BRAND, J.

As stated in the joint brief of the appellants, "The principal question presented by this appeal is whether the Oregon Milk Control Act empowers the Director of Agriculture to fix a compulsory differential between the minimum resale prices of milk sold in glass containers, and the minimum resale prices of milk sold in paper or fiber containers."

The plaintiff operates a dairy in the city of Portland, and is primarily engaged in the distribution of fluid milk and cream in the Portland Sales Area on a wholesale and retail basis. The defendant, E. L. Peterson, is the Director of Agriculture of the State of Oregon. On the 16th day of April, 1945, the defendant

issued an order directing that a public hearing be held at a time and place therein specified, to consider questions dealing with problems of production, distribution, processing, handling, marketing and selling of fluid milk and cream suitable for human consumption in the Portland Production and Sales Area. Notice of the hearing was given as required by law. Pursuant to the notice, the hearing was conducted by the defendant Peterson. Evidence was received and after the filing of briefs and hearing of arguments by all interested parties, the defendant made findings from which we quote the following portions:

"That a shortage of fluid milk and cream suitable for human consumption now exists within the Portland Production and Sales Area due to decreased production and increased consumer demands."

"1. That the hereinafter provided minimum wholesale and retail prices to be charged by milk dealers and distributors to consumers are reasonable and conform to the ceiling prices now permitted by the Office of Price Administration in the Portland Sales Area.

"    *    *    *

"4. That in determining the minimum resale prices to be charged by distributors to the consumer, consideration was given to the fact that substantially all fluid milk and cream distributed by various distributors, milk dealers and retail stores is by means of glass containers, and that no fiber containers are used except in very limited instances. The introduction of fiber containers in this market will necessitate a dual operation by existing licensees and milk dealers to meet the demands of the market, and such dual operation will substantially increase the cost of distribution in this market.

"5. That the price the consumers pay for milk

or cream includes the cost of the containers in which it is sold.

"6. That the nature of the Portland market is such that approximately 50% of all milk sold in quart containers is delivered to the consumer's home by distributors and 50% to wholesale accounts and require distributors to maintain a retail and wholesale operation.

"7. That experience with fiber containers in other markets outside of the State of Oregon demonstrates that the use of fiber containers results in a substantially greater cost per quart of fluid milk and cream than the use of glass containers.

"8. That the upcharge of 1c per quart or pint of fluid milk and cream, when distributed in a fiber container, is reasonably necessary to defray the additional cost including the additional investment required whether in a single or double operation, and is no more than is reasonably necessary to meet such additional cost.

"* * *"

Official Order G. O. No. 40 (A. O. No. 401) Findings, As to Prices to be Charged to Consumers by Milk Dealers and Distributors of Fluid Milk and Cream.

Based upon the findings, the defendant issued an order which by its terms became operative on September 1, 1945, and which has never been modified. Section 3 of said order, under the heading "Minimum Milk and Cream Prices", sets forth a separate schedule covering minimum wholesale and retail prices to be charged for various grades of milk and cream in pint and quart containers. Following the prices thus set forth, the order provides as follows: " * * * When single-service containers are used, add 1c to above prices for pints and quarts." It is this portion of the order which the plaintiff challenges as beyond the statutory authority of the Director of Agriculture.

The plaintiff alleges that it operates a processing plant and that it has spent large sums of money in the installation of machinery for the packaging of milk and cream in single-service fiber containers, and asserts other facts on the basis of which it contends that the enforcement of the order will cause it irreparable damage. The defendant, Peterson, by his answer, sets forth the facts concerning the notice and hearing, together with a copy of his official order. The intervenors, Multnomah Creamery, et al., filed their complaint in intervention and answer to the complaint of the plaintiff. The intervenors are processors, bottlers and distributors of fluid milk, whose business consists in the sale and distribution of milk in glass bottles. They have intervened in support of the order of the Director of Agriculture. Since the arguments presented by the defendant and by the intervenors are stated by them to be "identical", we shall for convenience refer only to the contentions of the defendant Peterson, unless special circumstances require recognition of a distinction between the two interests appearing in opposition to the claims of the plaintiff.

The Milk Control law was enacted in 1933 at the bottom of a major depression. The Preamble was as follows:

"Whereas the production and distribution of milk and cream is a paramount industry upon which to a substantial degree the prosperity and health of the people of the state of Oregon depend; and the present economic emergency is in a large part the result of the disparity between the prices of milk and cream and other commodities, which disparity has diminished the power of milk producers to purchase industrial products, has broken down the orderly production and marketing of milk and cream and has seriously impaired the agricultural

assets supporting the credit structure of the state and the local political subdivisions thereof; and

"Whereas unhealthful, unfair, unjust, destructive and demoralizing economic trade practices have grown up and are now carried on in the production, sale and distribution of milk and cream and milk and cream products in this state which impair the dairy industry in the state and the constant supply of pure, wholesome milk to the inhabitants thereof, and constitute a menace to the health and welfare of the inhabitants of the state; and

"Whereas, in order to protect the well-being of the people of the state of Oregon and promote the public welfare, the production, transportation, manufacture, storage, distribution and sale of milk and cream in the state hereby is declared a business affecting the public health and interest which should be supervised and controlled in the manner hereinafter provided."

The relevant portions of the statute on which the defendants rely are as follows:

O. C. L. A., § 34-1003, "The board hereby is declared to be an instrumentality of the state, vested with power (a) to confer and to cooperate with the legally constituted authorities of other states and of the United States, with a view of securing a uniform system of milk control with respect to milk coming into this state and going out of this state in interstate commerce, and particularly to cooperate with the duly constituted authorities of the United States vested with the administration of the agricultural adjustment act and the national industrial recovery act and such other acts of Congress as are designed to encourage and promote agricultural and industrial recovery, and to coordinate the activities of and the powers exercised by the board with said other duly constituted authorities with a view to accomplishing the purposes of this act and to enter into a compact or compacts for such uniform system of milk control; (b) to investigate with Oregon

State college all matters pertaining to the production, manufacture, storage, transportation, distribution and sale of milk in the state of Oregon; (c) to supervise and regulate the milk industry of the state, including production, as defined in section 13 hereof, transportation, manufacture, storage, distribution and sale of milk; (d) to act as mediator or arbiter in any controversial issue that may arise among or between milk producers and milk dealers as between themselves, or that may arise between them as groups; (e) to examine into the business, records and accounts of any milk dealer, to issue subpenas to milk dealers and to require them to produce their records, books and accounts; to subpena any other person from whom information is desired; (f) to take depositions of witnesses within or without the state; (g) to adopt and enforce all rules, regulations and/or orders necessary to carry out the provisions of this act; (h) to exercise such other powers as hereinafter are specified.''

O. C. L. A., § 34-1010, ''Licensees under this act shall keep adequate books and records showing (a) all milk received, with butterfat content, prices paid, deductions or charges made, the name and address of each person from whom milk was received; (b) all milk sold, classified as to grade, the prices and amounts received therefor and the market outlet and size and style of container; (c) the quantity of each milk product manufactured and quantity of milk used in the manufacture thereof; (d) all wastage or loss of milk or butterfat; (e) the items of the spread or handling expense and profit or loss represented by the difference between the prices paid and the prices received for all milk; and (f) such other records and information as the board may deem necessary for the proper enforcement of this act.''

O. C. L. A., § 34-1012, ''The board shall ascertain what prices for milk in each locality and market area of the state will best protect the milk industry and insure a sufficient quantity of pure and whole-

some milk in the public interest. The board shall take into consideration all conditions affecting the milk industry, including the price necessary to produce a reasonable return to the producer and to the milk dealer.

"After making such investigation the board shall, by order, fix the minimum wholesale and retail prices to be charged for milk handled and sold within the state for human consumption in fluid form, and including the following classes:

"(a) By producers or associations of producers to milk dealers; (b) by milk dealers to stores for consumption on the premises, or for resale to consumers or to others; (c) by stores to consumers or to others except for consumption on the premises where sold; (d) by producer-distributor and distributor for deliveries to homes of consumers; provided, that based upon differences in cost of said various services, if any, the board, upon facts found by it, may establish differentials in prices between house-to-house sales by dealers, house-to-house deliveries by stores, and sales on credit and over-the-counter sales by stores for cash.

"Where by statute, regulation adopted thereunder, or municipal ordinance, various grades of milk are specified, the board shall fix the minimum price as aforesaid, applicable to each grade. Orders fixing minimum prices may vary in different markets, and each shall designate the market to which it is applicable. In fixing minimum prices and the standards or grades to which they apply the board shall in each market area and production area take into consideration costs of production and distribution and the market conditions in the particular sales and production area to be affected by the order applying to such sales and production area. In those sales areas or production areas supplying the same where the dealers do not have adequate facilities for the blending or standardizing of whole milk, sold in its form as whole milk and where said blending or standardizing is not required under

applicable ordinances of the city or town in the sales area or laws of the state of Oregon, the minimum prices for milk sold in the form of whole milk shall not be graduated according to butterfat content.

"After the board shall have fixed the prices to be paid to the producer or association, and the prices at which milk shall be sold as provided in the preceding paragraph hereof, it shall be unlawful to buy or offer to buy, sell or offer to sell, any milk at prices other than the prices fixed by order of the board; and any method, device or transaction whereby any person buys or offers to buy, sells or offers to sell at a price less than that fixed by order of the board applicable to the grade of milk involved in the transaction occurred, whether by discount, rebate, free service, advertising allowance, gift or otherwise, hereby is declared unlawful. " * * * "

O. C. L. A., § 34-1015, "The board shall have power to make all necessary rules, regulations and orders to carry out the true intent and purpose of this act. * * * "

Violation of the provisions of the act is made punishable by fine or imprisonment or both. O. C. L. A., § 34-1017.

There is no serious difficulty in identifying certain of the principles which should guide us in determining whether the power claimed and exercised by the Director of Agriculture has been vested in him by the statute.

■ " * * * The court's province, after all, is to ascertain what the legislature intended from the language used, with such aid as may be found in the rules of interpretation and legitimate extrinsic sources; to construe statutes, not to enact them; to declare what the legislature has done, not what it should have done. * * * " *Fullerton v. Lamm,* 177 Or. 655, 163 P. (2d) 941, 165 P. (2d) 63.

■ If the language of a statute is plain and unambiguous, it needs no interpretation. *Wehoffer v. Wehoffer,* 176 Or. 345, 156 P. (2d) 830. The primary question relates to the *expressed* intent of the legislature for the determination of which we must look to the entire statute. *State ex rel Peterson v. Woodruff,* 179 Or. 640, 173 P. (2d) 961. When construction is necessary the court will consider the language used, the object to be accomplished, the history behind the act, and numerous other matters, no one of which is absolutely controlling as to the legislative intent. It is from a combination of all these that the intent is deduced. *Fox v. Galloway,* 174 Or. 339, 148 P. (2d) 922. A remedial statute should receive liberal construction so as to afford all the relief within the power of the court which the language of the act indicates that the legislature intended to grant. *Puget Sound Bridge & Dredging Co. v. State Unemployment Compensation Commission,* 168 Or. 614, 126 P. (2d) 37.

■■ The Milk Control Act must be classified as a remedial statute, and in its construction, it is proper to consider the evils which the legislature declared to exist, although the essential question in the case at bar relates to the remedies which the legislature authorized in view of the declared evils. While we have held that the preamble of a statute is not an essential part thereof, and neither enlarges nor confers powers, (*Portland Van and Storage Company v. Hoss,* 139 Or. 434, 9 P. (2d) 122), 81 A. L. R. 1136, nevertheless, in a doubtful case it has been held that the preamble may be considered in the process of construction. This principle has been recognized in the case of the Milk Control Act. Speaking of the evils which the Oregon Milk Control law is intended to correct, this court said:

"* * * They are recited in the preamble to

the act, and may be summarized as the demoralization of a paramount industry resulting from the economic emergency and unfair, unjust and destructive economic trade practices which impair the industry in the state and the constant supply of pure, wholesome milk to its inhabitants, and constitute a menace to the health and welfare of the inhabitants of the state. There is a further declaration that the milk industry is a business affecting the public health and interest. In the absence of countervailing evidence—and there is none—these recitals must be given variety [verity] by the court, * * *''. *Savage v. Martin,* 161 Or. 660, 91 P. (2d) 273.

■ The preamble of the statute declares the existence of a ''present economic emergency'', but in this it speaks only as of the date of its adoption in 1933. The remaining portions of the preamble merely set forth the evils ''which have grown up and are now carried on'' and declare that the transportation, manufacture, storage, distribution and sale of milk products should be supervised and controlled *''in the manner hereinafter provided.''*

O. C. L. A., § 34-1003 vests in the board (now the Director of Agriculture) power (a) to confer; (b) to investigate all matters pertaining to production * * * and sale of milk; (c) to supervise and regulate the milk industry, including production * * * and sale of milk; (d) to act as mediator; (e) to examine books and records; (f) to take depositions; (g) to adopt and enforce rules and orders ''necessary to carry out the provisions of this act''; (h) ''to exercise such other powers *as hereinafter are specified.''*

■ Relying upon the recognized principle that the court should consider the statute as a whole in ascertaining the legislative intent, the defendant contends that O. C. L. A., § 34-1003, supra, tends to indicate an

intent on the part of the legislature to authorize the imposition of a differential upcharge for milk sold in single-service containers, as distinguished from milk sold in glass bottles. We think that section 34-1003, O. C. L. A. fails to indicate any legislative intent to authorize the defendant to fix the minimum price of milk or to establish any price differential. Standing alone, the grant of power to supervise and regulate the industry, including production, sale, etc., would not authorize price fixing.

The milk control law of New Jersey strongly resembles the Oregon statute. The New Jersey law authorizes the board to fix the price to be paid to the producer and to be charged the consumer for milk. The board made an order fixing the price for the sale of milk from one milk dealer to another milk dealer. Article 3 of the New Jersey statute is similar to O. C. L. A., § 34-1003. Article 7 of the New Jersey act contains the specific provisions relating to the fixing of prices. The statutory authority of the board was challenged in *Supplee-Wills-Jones Milk Co. v. Duryee,* 116 N. J. Law 75, 181 At. 908. The court said:

"The order under review undertakes to fix the price for the sale of milk from one milk dealer to another milk dealer. There is no statutory authority for that action. It is said by the respondent that the power of the board to fix such a price is to be found in article 3, section 1 (a), N. J. St. Annual 1933, § 81-162A (27), which provides that the milk control board is declared to be the instrumentality of the state for the purpose of attaining the ends declared in the statute and is vested with power 'to supervise and regulate the entire milk industry of the State of New Jersey, including the production, importation, transportation, manufacture, storage, distribution, delivery and sale of milk

and milk products in the State of New Jersey * * *
Authority to fix prices is not a necessary sequence
to authority to regulate the manufacture, sale, and
delivery. We look upon article 7, not as an impair-
ment or qualification of the general powers of the
board, but as an amplification and extension thereof,
and we are of the opinion that the authority to fix
prices is to be found only in that article. We find
no authority therein for the fixing of a price from
one milk dealer to another, and so reach our con-
clusion that the board has no such power and that
the order is in that respect erroneous."

The foregoing conclusion was reached by the New
Jersey court notwithstanding the fact that the statute
provided in subdivision (g) that:

" ' * * * the operation and effect of any pro-
vision of this act conferring a general power upon
the board shall not be impaired or qualified by the
granting to the board by this act of a specific power
or powers, not inconsistent with the proviso con-
tained in paragraph (a) of this article. * * * ' " .

The court said:

" * * * It is, of course, not argued that sub-
division (g) adds any authority to the general
powers that is not already there. * * *"

The declaration in the preamble that the dis-
tribution and sale of milk should be "supervised and
controlled in the manner hereinafter provided" is no
more indicative of the power of price fixing than the
provision of section 34-1003. The title to the act, if
relevant to the inquiry, adds nothing more. It de-
clares the purpose to provide for the supervision and
control of the milk industry, to create a milk control
board for the purpose, and to prescribe the duties of
the board. There is no mention of any power to fix
prices, minimum or otherwise. The act was amended
by Laws of 1939, Chapter 197, but the only reference

to price fixing in the title in the amendatory act is as follows: " * * * to provide for * * * the fixing of minimum prices without graduation for butterfat content" in certain markets. We are not suggesting that the title was insufficient under constitutional requirements, but we do say that one may search the titles of the original and amendatory act, the preamble, and section 34-1003 of the act without finding anything which indicates an expressed legislative intent to extend the power of the defendant beyond that "specified" in O. C. L. A., § 34-1012, the section which deals specifically with price fixing. Defendant relies upon "very clear expressions of legislative intent" in section 34-1010, supra. That section requires licensees to keep adequate books and records relative to milk received, sold, prices charged, market outlet, size and style of container, expense incurred, profit or loss and the like. In view of the price fixing powers which are expressly delegated to the defendant under the provisions of section 34-1012, the requirements contained in section 34-1010 with reference to the keeping of records would be equally appropriate whether the particular power in question has or has not been delegated to the defendant. Section 34-1010 throws no more light upon the problem at issue than the other sections which we have considered.

In considering the legislative intent, it should be remembered that the plaintiff does not question the administrative power to regulate the distribution and sale of milk or the kind of container, whether paper or glass, in which milk may be sold. The defendant calls attention to the fact that the cream-line may be observed by the customer in a glass bottle, but cannot be seen in a paper container. Sanitary or other considerations may require that the use of various types

of container should be regulated, but the only question involved here is whether the legislature has empowered the defendant to impose a differential upcharge when milk is sold in a single-service carton. Since the other portions of the act do not disclose the asserted legislative intent, it follows that the question must be determined from the language used in O. C. L. A., § 34-1012 now to be examined.

■ Section 34-1012 provides that the board shall ascertain what "prices" will best protect the milk industry, and shall fix minimum wholesale and retail "prices". Defendant considers the use of the plural (prices) as significant. In each market area prices are to be fixed for sales by producers, milk dealers, stores, producer-distributors. The requirement that the board shall fix minimum wholesale and retail prices indicates that at least two different prices are to be fixed for sales by dealers within a given market area and the use of the plural was therefore necessary. The statute provides that in its investigation, the board shall take into consideration all conditions affecting the milk industry, including the price necessary to produce a reasonable return. In the operative portion of the statute, however, the only authority is to fix minimum wholesale and retail prices for the single commodity—milk. If prices are to be fixed on the basis of the container in which milk is sold, the authority for such action must be implied, for it certainly is not expressly granted by the statute. The statute provides that the board shall fix minimum wholesale and retail prices to be charged, "and including the following classes:" Then follows the enumeration of four classes: (a) By producers to milk dealers; (b) by milk dealers

to stores; (c) by stores to consumers, etc.; (d) by distributors for deliveries to homes. Immediately following the four classes we find the only clause which mentions establishment of differentials in prices. We quote:

"* * * provided, that based upon differences in cost of said various services, if any, the board, upon facts found by it, may establish differentials in prices between house-to-house sales by dealers, house-to-house deliveries by stores, and sales on credit and over-the-counter sales by stores for cash."

The words "said various services" clearly refer to the four classes, a, b, c, and d enumerated in the same sentence. The defendant contends that the maxim, expressio unius est exclusio alterius is not applicable because the statute contains the "broad and unlimited" power to fix prices to be charged for milk and that the words "and including the following classes * * *" (a, b, c, and d) constitute only illustrations and not limitations of power. In support of this contention the following cases are cited: *State of Oregon v. Standard Oil Co.*, 61 Or. 438, 123 P. 40; *Daly v. Horsefly Irrigation District*, 143 Or. 441, 21 P. (2d) 787; *Cabell v. Cottage Grove*, 170 Or. 256, 130 P. (2d) 1013, 144 A. L. R. 286; *Springer v. Philippine Islands*, 277 U. S. 189, 72 L. ed. 845; *Gray v. Powell*, 314 U. S. 402, 86 L. ed. 301; 50 Am. Jur. p. 240; *Dickey v. Raisin Proration Zone*, 24 Cal. (2d) 796, 151 P. (2d) 505, 157 A. L. R. 324; *Ramsay Motor Co. v. Wilson*, 47 Wyo. 54, 30 P. (2d) 482; *Grubbe v. Grubbe*, 26 Or. 363, 38 P. 182; *Commerce Trust Company v. Paulen*, 126 Kan. 777, 271 P. 388, 63 A. L. R. 384. It may be that the transactions indicated in classes a, b, c, and d are illustrative of the power to fix the price of milk and that some other

class similar to the four specified may be found, but it will be observed that each of the four classes is defined by specifying the person by whom and the person to whom milk is to be sold. If there be some other similar class of transaction which can be defined in like manner it may be that it would be deemed to fall within the power to fix the price of milk, although not enumerated in the statute, but we find greater difficulty with the proposition that a wholly different classification, one based on the character of the container, should by implication be construed to come within the power to fix the price of milk. Furthermore, it seems clear that the words "including the following classes" apply only to classes a to d inclusive. They do not apply to the proviso which specifically grants power to establish differentials in prices in enumerated instances:

The plaintiff cites the following cases in support of its contention that the maxim expressio unius applies: *Scott v. Ford,* 52 Or. 288, 97 P. 99; *Twohy Brothers v. Ochoco Irrigation District,* 108 Or. 1, 210 P. 873, 216 P. 189; *Union Pacific Railroad Co. v. Bean,* 167 Or. 535, 119 P. (2d) 575; *Botany Worsted Mills v. United States,* 278 U. S. 282, 289, 73 L. ed. 378, 385; *Continental Casualty Co. v. United States,* 314 U. S. 527, 533, 86 L. ed. 426, 431; *Anderson v. Commonwealth,* 54 S. E. 305, 105 Va. 533; 50 Am. Jur., Statutes, Sec. 244; Am. Jur., Statutes, Sec. 429, p. 450.

■ The maxim has been applied in innumerable cases and rejected in as many, which illustrates the fact that it is not a rule of thumb, but only one of many guides to construction. We think it may be significant that of the Oregon cases cited by the defendant, only one involves the construc-

tion of a statute vesting power of a legislative nature in an administrative body. In that case, *Cabell v. Cottage Grove,* supra, the court stated that the maxim should be applied with caution, but nevertheless the court applied it and denied to the Highway Commission the power claimed. *Union Pacific Railroad Co. v. Bean,* supra, cited by the plaintiff, involved the construction of a statute delegating power to the Public Utilities Commissioner to suspend railroad rates. This court applied the maxim and denied the power to suspend a schedule of reduced rates. For other cases in which the maxim has been applied in the construction of statutes delegating power to an administrative body, see *Botany Worsted Mills v. United States,* supra, and *Addison v. Holly Hill Fruit Products,* 322 U. S. 607, 88 L. ed. 1488, and see contra, *Dickey v. Raisin Proration Zone,* supra, upholding the power to make loans on the security of pooled raisins, a power executive in nature rather than legislative. One reason underlying application of the maxim in cases involving the delegation of power to administrative bodies is suggested in *Interstate Commerce Commission v. Cincinnati, N. O. & T. P. R. Co.,* 167 U. S. 479, 42 L. ed. 243. The controversy in that case was over the asserted power of the Interstate Commerce Commission to fix railroad rates under the Act of 1887. The first section of the act provided that " 'all charges * * * shall be reasonable and just; * * *' ", and further provided that "'* * * 'the Commission is hereby authorized to execute and enforce the provisions of this act.' * * *" The court said:

> "The question debated is whether it vested in the Commission the power and the duty to fix rates; and the fact that this is a debatable question, and has been most strenuously and earnestly debated,

is very persuasive that it did not. The grant of such a power is never to be implied. The power itself is so vast and comprehensive, so largely affecting the rights of carrier and shipper, as well as indirectly all commercial transactions, the language by which the power is given had been so often used and was so familiar to the legislative mind and is capable of such definite and exact statement, that no just rule of construction would tolerate a grant of such power by mere implication. * * *''

Again the court said:

''The power to prescribe a tariff of rates for carriage by a common carrier is a legislative and not an administrative or judicial function * * * is a power of supreme delicacy and importance. * * * That Congress has transferred such a power to any administrative body is not to be presumed or implied from any doubtful and uncertain language. The words and phrases efficacious to make such a delegation of power are well understood and have been frequently used, and if Congress had intended to grant such a power to the Interstate Commerce Commission it cannot be doubted that it would have used language open to no misconstruction, but clear and direct. * * *''

■ This court has recognized certain special guides to statutory construction which apply when the question to be determined is the extent of power which has been delegated to an administrative body. When the issue relates to the delegation of power to fix prices, and particularly to the fixing of minimum prices, these rules deserve serious consideration. In *Board of Railroad Commissioners of the State of Oregon v. Oregon Railway and Navigation Company,* 17 Or. 65, 19 P. 702, this court said:

''It has for a long time been considered the safer and better rule, in determining questions of jurisdiction of boards and officers exercising pow-

ers delegated to them by the legislature, to hold that their authority must affirmatively appear from the commission under which they claim to act.

"There is too strong a desire in the human heart to exercise authority, and too much of a disposition upon the part of those intrusted with it to extend it beyond the design for which, and the scope within which, it was intended it should be exercised, to leave the question of its extent to inference. Should it be so left, serious disturbances might arise, involving a conflict of jurisdiction which would be highly detrimental to the community.

"It is not, it seems to me, requiring too much of the legislative branch of the government to exact, when it creates a commission and clothes it with important functions, that it shall define and specify the authority given it so clearly that no doubt can reasonably arise in the mind of the public as to its extent."

█ In the more recent case of *Layman v. State Unemployment Compensation Commission*, 167 Or. 379, 117 P. (2d) 974, 136 A. L. R. 1468, the court said:

"It is an elementary and fundamental principle, which no one will dispute, that a commission, created by the legislature to administer a statute, is wholly limited in its powers and authority by the law of its creation. No more unwholesome doctrine could be suggested than that such a body is vested with discretion to ignore or transgress these limitations even to accomplish what it may deem to be laudable ends. That would be to leave room for that 'play and action of purely personal and arbitrary power' condemned in Yick Wo v. Hopkins, 118 U. S. 356, 6 S. Ct. 1064, 30 L. Ed. 220, 226. If the statutes as written is not workable, then the remedy is with the legislature. * * *."

█ Reliance is placed upon *Borden's Farm Products Co. v. Ten Eyck*, 297 U. S. 251, 80 L. ed. 669 wherein the Supreme Court of the United States upheld the

constitutionality of the New York Milk Control Act which required a one cent differential between advertised and non-advertised brands of milk. The defendant argues that the only difference between the statute there and what is involved here is that the administrator invokes the classification on the paper bottle whereas in the Borden case the differential was fixed by the legislature. That very difference is, however, an important one. If the only question in each case were constitutionality, the distinction between them would be unsubstantial, but in the case at bar we are dealing with statutory construction, not constitutionality. In the Borden Farm Products case, the statute itself expressly fixed the differential and hence the considerations relative to the construction of a statute delegating power to a commission were not involved.

The right of the private citizen to fix the price at which he will sell has been so deeply ingrained in the legal and economic system of the country that even the constitutionality of price fixing statutes when applied to private business "affected with a public interest" has been seriously questioned within recent memory. *Nebbia v. New York,* 291 U. S. 502, 78 L. ed. 940, 89 A. L. R. 1469, and see *Van Winkle v. Fred Meyer, Inc.,* 151 Or. 445, 49 P. (2d) 1140. When it is contended that such powers have been delegated by implication to an administrative body, the rule of construction as set forth in *Board of Railroad Commissioners of the State of Oregon v. Oregon Railway and Navigation Company,* supra, should be given consideration.

The defendant relies upon the decision in *American Can Company of Massachusetts v. Milk Control Board,* 316 Mass. 337, 55 N. E. (2d) 453. The petitioner in that case was engaged in the business of leasing and

selling machines and containers for use in the process of packaging milk and cream products in paper cartons. The order, as in the case at bar, required a compulsory upcharge when milk or cream is sold in single-service paper containers. The order was challenged on the ground of unconstitutionality. See also *American Can Company of Massachusetts v. Milk Control Board,* 313 Mass. 156, 46 N. E. (2d) 542. The Superior Court entered a decree enjoining the Milk Control Board from enforcing the order and from issuing any similar order. The Massachusetts Supreme Court, upon appeal, held that the board in fixing minimum prices could take into account "not only the kind or quality of the product sold but the entire service rendered by the seller" and that a higher minimum price could be fixed for milk where the container is furnished than where it is not furnished. The court said:

"* * * We can conceive of no way in which such a 'container charge' can reasonably be supposed to have any tendency to accomplish the objects of the law, and none has been pointed out to our satisfaction, unless it is a fact that in the long run paper containers are more costly than containers of glass or of other materials which can be used more than once, so that a dealer who sells milk in paper containers furnishes to his customer a different and more expensive service than one who sells the same milk in some other container and is therefore reasonably entitled to the benefit of a higher minimum price fairly proportional to the higher cost. We are of the opinion that the test of the validity of the so called 'container charge' is to be found in the answer to the question whether the use of the container with respect to which the charge is imposed is a more costly method of selling milk than is the use of containers with respect to which no charge is imposed." *American Can Company of Massachusetts v. Milk Control Board,* supra.

It will be recalled that the petitioner was not a milk dealer and the argument of the court that a dealer who furnishes his customer a more expensive service by using paper containers is "therefore reasonably entitled to the benefit of a higher minimum price" is scarcely applicable to the case at bar. The plaintiff here is a milk dealer. It does not claim to be entitled to the benefit of a higher minimum price, but on the contrary it claims to be entitled to furnish the allegedly more expensive service without being required to charge a higher minimum price. The Massachusetts court said:

"* * * If a difference in the quality of the transaction is accompanied by a difference in cost we think that the foundation might be laid for a difference in price. Since we think circumstances might conceivably exist which would justify a price differential of the character here involved, we do not understand how the board can be precluded in advance from exercising its authority by making in good faith a proper and reasonable order, if such circumstances should exist."

In holding that the board in fixing minimum prices can take into account not only the kind or quality of the product sold, but the service rendered by the seller in making the sale, the court relied upon the provisions of § 21 of G. L. (Ter. Ed.), c. 94A., Statutes, 1941, ch. 691. The Massachusetts statute is similar, but by no means identical to that of Oregon. Section 2 defines the powers of the board which include the power to define market areas, supervise and regulate the milk industry "including the production, purchase, receipt, sale, payment and distribution of milk", to prescribe regulations, to investigate and regulate all matters pertaining to markets, production, distribution "sale", etc. of milk, to make all orders not inconsistent with

law which it deems necessary or desirable to administer or effectuate any of the purposes of the act. Section 11 provides that the board shall by order fix the minimum prices to be paid by milk dealers to other milk dealers and to producers and customers "and the terms and conditions under and times at which such prices are to be paid." The statute then provides that:

"* * * Any such order may classify such milk by such forms, classes, grades or uses as the board may deem advisable and may specify the minimum prices therefor, and may require that producers of milk purchased or received under such provisions shall be paid for all such milk on the basis of the class, grade or use in which it is ultimately sold by milk dealers."

The Massachusetts act resembles the Oregon statute in that it vests in the board general authority to regulate and then proceeds with the enumeration of instances in which minimum prices may be fixed. The Massachusetts act, however, differs from the Oregon statute in certain important respects. The Massachusetts court was precluded from considering the bearing of the maxim, expressio unius est exclusio alterius because the statute expressly provided in section 2 as follows:

"No provision of this chapter conferring a general power upon the board shall be deemed to be impaired or qualified by the granting to the board of any specific power or powers."

The other notable distinction is to be found in the broad language in which the price fixing provisions are framed. Such orders which apply to the locality in which milk is produced or is sold, or both "may vary in different localities or markets according to the varying and differing conditions therein."

It is particularly significant that the right to classify

is not limited to classes or grades of milk, but the order may classify such milk by such forms or uses "as the board may deem advisable and may specify the minimum prices therefore." No such provision appears in the Oregon statute.

The same question which is presented in the case at bar has been before the California Appellate Courts. The Director of Agriculture issued an order requiring a differential upcharge if milk is sold in fiber containers. The plaintiff, a cooperative association having 32,000 members was, at the time distributing 2,300,000 pounds of whole milk a year in fiber cartons. It brought suit to enjoin the Director of Agriculture from enforcing the order upon the ground that there was no statutory authority therefore. The Superior Court issued a perpetual injunction. The case was taken to the District Court of Appeal where the decree was affirmed. *Challenge Cream and Butter Association v. Parker,* 125 P. (2d) 864. On appeal to the State Supreme Court it was held that the order imposing the compulsory upcharge was without authority of law and the decree was again affirmed. *Challenge Cream and Butter Association v. Parker,* 23 Cal. (2d) 137, 142 P. (2d) 737, 149 A. L. R. 1203. We will first consider the opinion of the District Court of Appeal.

In brief summary, the California act provides for investigations and hearings, then directs that in determining minimum wholesale and retail prices the director shall take into consideration the following economic factors operative in each marketing area, the quantities distributed, the extent of the demand, the cost to distributors and stores, the reasonable cost of handling the product by distributors and retail stores,

" * * * including all costs of hauling, processing, selling and delivering by the several methods used in such marketing area in accomplishing such hauling, processing, selling and delivery * * *" The costs thus to be taken into consideration are those which are "* * * reasonably determined by the director to be sufficiently representative to indicate the costs of all distributors and retail stores, respectively, in such marketing area." He is to consider plant capacity in the area and the purchasing power of consumer therein. The District Court of Appeal said:

" * * * But in no event may minimum wholesale price be based on nor be determined on any one single factor. Otherwise there must necessarily be as many prices as distributors. But the statute clearly contemplates the prices will be based on all of the factors enumerated in section 736.12 of the Agricultural Code and will apply to all distributors similarly engaged in any one marketing area as fixed and determined under any by the terms of section 736 of said code. That that is so is indicated by other provisions of the statute. By its title (Stats. 1935, p. 922) the statute is one 'relating to the stabilization and marketing of fluid milk and fluid cream.' We find no section at variance with, but all in accord with 'stabilization.' But to hold that a separate price may be formulated and based on each change is to unstabilize rather than to stabilize. Furthermore the statute does not frown on new machinery, new processes, or new methods. It is written to encourage not to obstruct such matters. * * *"

" * * *

"If a variance in the cost between glass containers and fiber containers, constitutes a ' * * * substantial and reasonably recognizable and separable * * *' difference which will justify the creation of a different class, it is clear that many classes must be created for similar reasons, and

following the practice there will be no 'stabilization' and the very reason for the enactment of the statute will be set aside.

"The defendant notes that the statute in several places uses the expression 'types or methods' and he argues that expression refers to 'fiber or glass' containers. We think that is not a correct construction. The expression was inserted in the statute when it was amended. Stats. 1937, p. 1373. At that time fiber containers for milk were not known to the trade. But at that time deliveries to dwellings, hotels, restaurants, and stores were commonly practiced and were different 'methods and types' of distribution. In the latter sense the words should now be construed.

" *  *  *

" *  *  * But if one distributor uses bottles for containers and another uses fiber containers, if one uses gasoline trucks and another uses distillate trucks, or if one ships by rail and another ships by truck or horse drawn vehicles, the variation in costs will not warrant numerous sales prices instead of the stabilized price which the statute authorizes the director to determine and enforce."

The opinion of the California Supreme Court summarized the purposes of the act as follows:

" *  *  * That the people shall be able to purchase milk at the lowest price at which enough distributors operating with average efficiency will be able to do business at a reasonable profit so as to supply the demand of all the consumers in the marketing area. In order to effect this purpose producers and distributors must be prohibited from selling their milk at a lower price than that at which the entire consumer demand can be supplied at no more than a reasonable profit.  *  *  *

"It is of particular significance in this connecnection that nothing in the act prevents a particular producer or distributor from selling at the minimum price even though, by the use of more expensive

equipment or unwise management, he is marketing his product at a price less than enough to return to him a reasonable profit. In such an event, the sanitary laws regulating the industry must be considered adequate to insure a good quality of milk. An ordinary business practice would seem to make certain that if a distributor cannot use cartons and make sufficient profit to remain in business when selling at the minimum price, he will discontinue marketing his product in the single-trip container and return to delivery in bottles. For, obviously, if he sells at a higher price than that charged for milk in glass bottles, the consumer will buy the same grade and quality from his competitor at the lower rate unless there is some special inducement in the fiber container itself which makes it worth the added cost.

"  *    *    *

"The only theory upon which the director's ruling may be sustained is that, by using cartons and selling at the minimum price charged by competitors, a reasonably efficient distributor will not profitably be able to stay in business, and, without such facilities, the milk supply will be inadequate to meet the necessary consumer demand. But such a conclusion must be based upon the dubious assumption that if an individual or organization operating with average efficiency could not carry on at a profit using the single-trip container, the business would be discontinued rather than changed over to use bottles. Such an assumption is not in accord with realities.

"  *    *    *

"Although on its face the clause requiring the director to consider the reasonable cost of handling milk would appear to authorize him to take into consideration the cost differential of various types of container, such a factor could not have been in the minds of the legislators in referring to the 'several methods' of hauling, processing, selling and delivering milk, or 'distribution facilities of the sev-

eral types or methods commonly used by consumers.' In 1937, when this language was added to the statute, it was unlawful, according to section 479 (b) of the Agricultural Code, St. 1937, p. 642, to sell or dispose of milk except in sterlizied standard bottles. * * *

"In view of these indications of the want of legislative intent to include the type of container in which a given quantity and quality of milk is delivered as a cost factor in the determination of minimum prices, together with the undeniable fact that the purpose of the act to protect the producers and distributors from being undersold is not affected by such a cost factor in the business of a competitor and the realistic acknowledgment of the fact that, if a distributor could not profitably operate by the use of one type of container, he would make use of the alternative cheaper one, the words in section 736.12 supra, 'by the several methods used in such marketing area in accomplishing such hauling, processing, selling and delivery,' reasonably refer only to the variations of method involved in serving wholesale, retail store, and home-delivery customers. The differing needs of these customers has a definite effect upon cost factors in the types of vehicles in which deliveries are made. Wholesale deliveries require large trucks and relatively few stops. In making home deliveries, with frequent stops, smaller trucks may be utilized. And the use of large containers effects a saving in labor costs. These factors are uniform with all producers and distributors. But a differential in price for the same quantity, quality and type of delivery, merely because of a difference in the construction of the container in which the milk is distributed, serves only to increase intertrade friction and violates the aim of a uniform minimum price in the particular marketing area.

"For all these reasons, in the absence of any express legislative declaration to a contrary effect, the statute must be held not to include as a cost

factor which the Director of Agriculture may consider in determining minimum prices, any differential in the type of container used for the delivery of the same quantity and quality of milk." *Challenge Cream & Butter Ass'n v. Parker,* supra.

The same question has been before the Supreme Court of Appeals of Virginia, 182 Va. 490, 29 S. E. (2d) 397. In that state the commission found that the cost of delivery in glass under a bottle deposit requirement was less than the cost of delivery in paper containers and it established a compulsory upcharge of one cent per quart for the use of the latter. Section 1211 Code of Virginia 1942 gives the commissioner power to investigate all matters pertaining to production, selling, etc. The court said:

"Subsection (c) gives the Commission power 'to supervise, regulate, and control the production, transportation, processing, storage, distribution, delivery and sale of milk for consumption within the Commonwealth of Virginia.' There is nothing said about the power to fix the price at which milk may be sold."

The Virginia statute, like the Massachusetts one, provides that:

"The operation and effect of any provision conferring a general power upon the commission shall not be impaired or qualified by the granting to the commission by this act of a specific power or powers."

This section was obviously intended to exclude consideration of the maxim, expressio unius est exclusio alterius. In the construction of the statute, notwithstanding that provision, the Virginia court held that the commission was without statutory authority to make the challenged order.

Subsection (j) of the Virginia statute provides that

the commission "may fix the minimum and maximum wholesale and retail prices to be charged for milk in any market, and may also fix different prices for different grades of milk. In determining the reasonableness of prices to be paid or charged in any market or markets for any grade, quantity, or class of milk, the commission shall be guided by the cost of production and distribution, * * *" The court said:

"If the legislature had not intended that subsection (j) should provide the sole provision for fixing prices, it would have provided that power in subsection (c) and not added subsection (j) to the preceding sections.

" * * * *

"It is a well established principle of statutory construction that when a specific power is granted by a statute and the limits of such power are therein marked out, the section granting the power and not general provisions in other sections of the statute must be looked to in ascertaining the effect and extent thereof.

"The authority to fix prices, like the power to assess taxes, is the power to destroy. It is an extraordinary power and not lightly granted, and when granted is subject to the limitations of the grant.

" * * * The Commission has the power and authority to fix different prices for different grades of milk. It has not been given the power to fix a different price for the same grade of milk. In fixing the different prices for different grades, it is mandatory that it take into consideration all of the factors and elements involved in its production, processing, storage, and distribution. Necessarily included in these factors is the cost of some form of container.

"The Commission cannot set a price for milk which will yield exactly the same profit to each producer and distributor. It must be conceded that there is a variance in the cost of the several

factors involved in the production and distribution of milk. Feed and labor may cost one producer or distributor less than another. Mechanical processes of one may involve less expense than another. The expenses of transportation may be greater or less, according to the delivery vehicle used and the length of the haul. One distributor may employ more effective methods in the care and salvage of the container. Another may use a different and less costly or attractive container. One producer may, by inventive genius or economic measures, cut down his expenses; while another may be unwilling to avail himself of the benefits and economies practiced by a competitor.

"A container is as essential as transportation and its cost may be as variant; but its cost factor must be considered just as the cost of transportation and the other elements mentioned in the statute must be considered. Having taken into consideration all of the factors, once a price of milk is fixed for a grade it must be the same for all milk of that grade, and that is not varied by the fact that it may be delivered in glass jars, tin cans, or paper cups, or by automobile or horse and wagon. Otherwise, the degree of stabilization purposed by the statute would be decreased as the number of prices based on factors of production and distribution is increased and varied. A price determined on any one cost factor, or the elimination, in part or whole, of any one or more factors, will result in as many different prices as there are distributors.

"  *    *    *

"The Act was not intended to discourage the installation of new machinery, the employment of new processes, or the practice of economical operation. Rather it was intended to encourage them, both as a benefit to the producer and the consumer, and thereby favor the public weal.

"  *    *    *

"If a milk producer or distributor cannot use cardboard containers and make a sufficient profit

to remain in business, when selling at the minimum price, he will, in all probability, discontinue marketing his product in such a container and return to delivery in bottles.

"    *    *    *

"To eliminate, in part or whole, an essential factor in the cost of distribution in the determination of the reasonableness of the price to be charged for a specific grade of milk in a designated area, and thereafter use that factor as a basis for a differential in price for the same grade of milk is violative of the letter and the spirit of the statute in form and in substance. It is productive of discrimination against producers and distributors using different containers, unjust and costly to consumers who may be unable to purchase, for any reason, the lower priced milk of the grade desired, and contrary to the statutory plan of stabilization." *Lucerne Cream and Butter Company v. Milk Commission of Virginia,* supra.

■ In addition to the provisions of O. C. L. A., §34-1012 to which we have referred, that section also provides that, "Where by statute, regulation adopted thereunder, or municipal ordinance, various grades of milk are specified, the board shall fix the minimum price as aforesaid, applicable to each grade." The use of the word "price" instead of "prices" tends to indicate that as to the various grades of milk there shall be only one price for one grade, subject to the other provisions of the statute authorizing classification.

■ It is argued that the power to establish a differential upcharge for milk sold in single-service containers is to be found in the provision that "in fixing minimum prices and the standards or grades to which they apply the board shall in each market area and production area take into consideration costs, market conditions",

etc. It is said that the word "standard" must mean something distinct from "grade" and that milk sold in paper cartons is of a different standard. Reference to the terminology used in the chapter of the Agricultural Code entitled "Grades and Standards" gives no support to the proposed construction. That chapter provides that separate "grades and standards" shall be established for milk and cream and shall be based upon (a) bacterial test, (b) sediment content, (c) acid content, (d) flavor, (e) odor, (f) cleanliness, and (g) wholesomeness. The statute continues, "such grades and standards may be changed  *  *  *." O. C. L. A., § 34-201.

■ The defendant seeks to support his position by reference to the finding made by him at the administrative hearing that "the price the consumers pay for milk or cream includes the cost of the containers in which it is sold." The statute undoubtedly contemplates that the price paid shall cover all reasonable costs, including the cost of getting the milk to the consumer in something that will contain it, but the price paid for milk does not include the cost of the paper carton any more than it includes other costs, such as the handling, washing, etc. of glass bottles.

■ At the hearing the Director made a finding that substantially all fluid milk and cream distributed is by means of glass containers and that no fiber containers are used except in "very limited instances." He now asserts the right to single out one item of cost, incurred only by a few in very limited instances, and to require the few affected to charge more for a quart of milk than is required of the others in the industry who deliver substantially all of the fluid milk sold. The finding of the Director is that the use of fiber containers costs more than glass. He does not find that

the plaintiff's total costs, including the use of fiber, are any higher than the costs of the other dealers. If the statute is to be construed as authorizing an up-charge based on a single item of cost, incurred by only a few, then we would be compelled to hold that any other distributor whose practice involved some other single item of cost greater than the average, could also be subject to an upcharge. The items of cost to a producer or distributor are many and varied. They may include taxes, urban or rural, labor costs, union or non-union, delivery costs, whether by air, water, rail, motor or horse. We think the intent of the act is that the Director should, in fixing prices in a given locality for each class, (a) to (d), and for each grade of milk, consider the over-all condition of the industry, applicable to the locality, class and grade in question, and determine the minimum price which should be fixed which will prevent the demoralization of the industry and promote the public welfare. When rea-sonable representative costs have thus been determined, differentials in price between house-to-house sales by dealers, house-to-house deliveries by stores are ex-pressly authorized by the proviso in O. C. L. A., § 34-1012 and similar differentials may be made between sales on credit and sales by stores for cash, but such differentials must themselves be based on differences of cost of said various services.

In harmony with the views of the California and Virginia courts, we think the indicated legislative intent to be that the item of reasonable cost of packaging in paper or glass is to be considered along with all other items of cost in the fixing of minimum prices for the sale of milk, but if the cost of packaging by one method rather than another is thereafter singled out as the basis for an upcharge, the result would be

that a single item of cost is given double consideration. The defendant assures us that one of the primary purposes of the milk control regulation of prices was to stabilize the price structure. If minimum prices are fixed on the basis of representative reasonable total costs, stabilization will follow. If separate upcharges are made, based on single items of cost to a few distributors, we fail to see how stabilization would be promoted.

The defendant seeks to distinguish the California case because, at the time the act was passed it was unlawful to sell milk except in bottles. We are told that "when the Oregon statute was adopted the fiber container was not a factor in the state * * *" There is little more reason to suppose that the legislature intended to authorize an upcharge on account of a nonexistent practice than on account of a prohibited one.

The defendant concludes that if he permits the plaintiff to sell milk in paper cartons at the same price as milk sold in bottles, it will result in a higher price for all milk to the consumer. The argument in his brief runs thus: The dealer is entitled to a reasonable return; a fiber container costs one cent more than glass; if fiber containers are widely used, all dealers, for competitive reasons, must use them; if the Director permits milk to be sold in fiber containers at the same price as milk sold in glass, the dealer will not be receiving a reasonable return and so the Director of Agriculture would have "no alternative other than to increase the margin of all dealers, whether handling milk in paper or in glass", and thus the public would be compelled to pay more. The argument is based on an unstated but implied premise that the price for milk is fixed at the lowest figure which can yield a reason-

able return. It is not argued that milk dealers who use the paper carton will voluntarily raise the price of milk, as they have a perfect right to do, and as plaintiff might, but does not wish to do. On the contrary, it is said that if the public is required to pay more for all milk it will be because the Director has raised the minimum price and that such a raise will be necessary because a small part of the milk sold is more expensively packaged than the rest. If, as the defendant assumes, the present minimum price is no more than enough to give a reasonable return for milk sold in bottles, and if milk sold in fiber cartons is more costly, then it would seem that there is no reason to expect that the plaintiff or anyone else will long continue a practice resulting in a net loss. If that be the situation, the other dealers would not adopt the paper carton and there would be no reason for raising the minimum price at which all milk must be sold. We suspect the fact to be that other dealers probably would adopt the fiber carton for competitive reasons if there is no upcharge involved, but if they do so it will be because there is a public demand for that service and because it appears to them that it will be more profitable to compete on that basis than to continue with bottles alone at a lower cost. If the trade generally adopts a single more costly item of service, (the paper carton) voluntarily, when it could avoid the expense by selling only in glass, it is not clear to us why the Director should "have no alternative" other than raising minimum prices.

In accordance with the admonition of the defendant, we have examined the act in its economic context, as evidenced by the findings of the Director, but only for the purpose of determining the legislative intent in a realistic light. We are not concerned with

the reasonableness of the order if it is authorized by statute.

■ If, in a doubtful case, the court should expand the legislative delegation of power beyond the legislative intent, it would, to that extent usurp the function of a coordinate department and permit the immediate exercise of powers which are not for courts to bestow. If we too narrowly construe powers which at best can arise only by implication, the legislature at its ensuing session can make explicit what is now claimed as implicit. We consider the safer course, supported by the better reasoning, to hold that the statute does not authorize the order fixing a differential upcharge in the price of milk sold in single-service containers.

■ The rule requiring plaintiff to exhaust his administrative remedies before resorting to the court has no application when the attack upon the administrative order is based upon the contention that the administrative body is without statutory power to issue the order. *Skinner v. Eddy Corporation v. U. S.,* 249 U. S. 557, 63 L. ed. 772; *Varney v. Warehime,* 147 Fed. (2d) 238. The cases cited by the defendant as being to the contrary are not in point. The decree of the Circuit Court is affirmed without costs to either party.