Argued February 4, affirmed June 24, 1976

# SCHWENK, *Appellant,*
## *v.*
# BOY SCOUTS OF AMERICA, *Respondent.*

551 P2d 465

Argued and submitted February 4, 1976.

*Carol A. Hewitt* of Lindsay, Nahstoll, Hart, Dafoe & Krause, Portland, argued the cause and filed a brief for appellant.

*Fredric A. Yerke* of Miller, Anderson, Nash, Yerke & Wiener, Portland, and *Philip A. Lacovara* of Hughes, Hubbard & Reed, Washington, D.C., argued the cause for respondent. With them on the brief were Christie H. Wiater of Miller, Anderson, Nash, Yerke & Wiener, and John C. Fontaine and Eugene H. Zagat,

Jr. of Hughes, Hubbard & Reed, New York City, New York.

*Charles J. McMurchie* of Davies, Biggs, Strayer, Stoel & Boley, Portland, filed a brief for amicus curiae Camp Fire Girls, Inc., in support of respondent.

*Terry DeSylvia* of Black, Kendall, Tremaine, Boothe & Higgins, Portland, filed a brief for amicus curiae Girl Scouts of the United States of America and Young Women's Christian Association, in support of respondent.

Before O'Connell, Chief Justice,* and Denecke,** Holman, Tongue, Howell and Bryson, Justices.

TONGUE, J.

*Chief Justice when case was argued.
**Chief Justice when case decided.

## TONGUE, J.

This is an action brought by a nine-year-old girl, through her mother as her guardian ad litem, to recover damages for the violation of the Public Accommodation Act (ORS 30.670 et seq.) resulting from defendant's refusal to accept plaintiff's application for membership as a cub scout. Defendant demurred to plaintiff's complaint on the ground that it failed to state a cause of action. The demurrer was sustained and plaintiff appealed. We affirm.

The complaint alleges that defendant is a congressionally-chartered corporation (36 USCA § 21 et seq.); that it operates a program of cub scouting in Oregon through its Columbia-Pacific Council located in Portland; that membership in the cub scouts is open to a person who has completed the second grade, or is eight years of age or older but is not yet 11, and who is of the male sex; that plaintiff submitted a registration form to defendant requesting that she be admitted to Boy Scouts of America through her local cub scout pack but that defendant, through its Columbia-Pacific Council, rejected plaintiff's registration form on the ground that plaintiff is female. It is further alleged that plaintiff meets all of the qualifications for participation in Boy Scouts of America except that plaintiff is female rather than male; that defendant is a "place of public accommodation" (within the meaning of ORS 30.675) in that it is an organization which is sponsored in part by public schools and public funds and offers scouting services and programs to members of the public in Oregon; that defendant's exclusion of plaintiff from the cub scouting program and defendant's policy of limiting its membership to persons of the male sex is a distinction, discrimination or restriction on account of sex in violation of ORS 30.680. Plaintiff prays for $100 general damages and a declaration that defendant's exclusion of plaintiff from the Boy Scouts of America constitutes a violation of ORS 30.675.

Plaintiff makes no contention that defendant's

refusal to accept her application constitutes a violation of her constitutional rights under either the United States or Oregon Constitution, nor does she contend that defendant's conduct violates the Federal Civil Rights Act of 1964 (42 USCA §§ 2000a et seq.). Her sole contention is that defendant's refusal to grant membership in the Boy Scouts of America violates Oregon's Public Accommodation Act (ORS 30.670-30.685). The Act provides as follows:

"30.670 All persons within the jurisdiction of this state shall be entitled to the full and equal accommodations, advantages, facilities and privileges of any place of public accommodation, without any distinction, discrimination or restriction on account of race, religion, sex, marital status, color or national origin.

"30.675 (1) A place of public accommodation, subject to the exclusion in subsection (2) of this section, means any place or service offering to the public accommodations, advantages, facilities or privileges whether in the nature of goods, services, lodgings, amusements or otherwise.

"(2) However, a place of public accommodation does not include any institution, bona fide club or place of accommodation which is in its nature distinctly private.

"30.680 All persons against whom any distinction, discrimination or restriction on account of race, religion, sex, marital status, color or national origin has been made by any place of public accommodation, as defined in ORS 30.675, by any person acting on behalf of such place or by any person aiding or abetting such place or person in violation of ORS 30.685 shall have a cause of action to recover compensatory and punitive damages from the operator or manager of such place or the employe or person acting on behalf of such place or the aider or abettor of such place or person. In the action the operator or manager of such place, the employe or person acting on behalf of such place or the aider or abettor of such place or person shall be jointly and severally liable. Any person recovering damages under this section shall be entitled to reasonable attorney fees as determined by the court in addition to costs and necessary disbursements.

"30.685 It is unlawful for any person to aid or abet

[ 330 ]

any place of public accommodation, as defined in ORS 30.675 or any person acting on behalf of such place to make any distinction, discrimination or restriction on account of race, religion, color, sex, marital status or national origin."

Defendant contends to the contrary, among other things, that the legislative history of ORS 30.670 et seq. shows that the purpose of the Public Accommodation Act is to bar discrimination in *businesses* which offer goods or services to the public and that "the legislature did not intend to force * * * organizations like Boy Scouts to change long established membership policies," and that to so interpret that law would lead to "absurd, unreasonable results."

In our judgment, this court need not decide whether the "broad" interpretation of the Public Accommodation Act urged by the plaintiff would or would not lead to such results as a flood of applications by boys to attend and participate in all "accommodations" and "services" provided for girls in summer camps operated by such organizations as the Camp Fire Girls, including dormitory accommodations, or whether such a result would be "absurd or unreasonable." The reason, in our view, is that the term "place or service" is "ambiguous," at least in a legal sense, because the words "place" and "service" are general terms and the intended meaning of such words in any given context may depend upon the intent with which such words were used.[1] For that reason, this court may properly consider the legislative history of ORS 30.675 for the purpose of determining, if possible, the intent of the legislature in the use of that term.[2]

The Public Accommodation Act was first enacted in

---

[1] See *Allen v. Multnomah County,* 179 Or 548, 553-54, 173 P2d 475 (1946); 2A Sutherland Statutory Construction 4-5, § 45.02 (4th ed Sands 1973).

[2] See *State v. Sisney,* 250 Or 198, 200-01, 440 P2d 372 (1968). See also *Sunshine Dairy v. Peterson et al,* 183 Or 305, 317, 193 P2d 543 (1948). See generally 2A Sutherland Statutory Construction, *supra* note 1, 181-227, ch 48.

1953. As originally enacted, it prohibited discrimination "on account of race, religion, color or national origin" in any "place of public accommodation," which was defined as follows:

"* * * any hotel, motel or motor court, any place offering to the public food or drink for consumption on the premises, or any place offering to the public entertainment, recreation or amusement; * * *." Oregon Laws 1953, 872, 873, ch 495, § 2.

According to a statement by one of the principal sponsors of that statute at a hearing during its consideration by the State and Federal Affairs Committee of the Oregon House of Representatives on April 7, 1953, it appears that the intended purpose of the bill was to prevent "operators and owners of *businesses* catering to the general public to subject Negroes to oppression and humiliation * * *." (Emphasis added)

In 1957, the law was amended to define a "place of public accommodation" as:

"(a) Any hotel, motel, motor court, trailer park or campground.

"(b) Any place offering to the public food or drink for consumption on the premises.

"(c) Any place offering to the public entertainment, recreation or amusement." Oregon Laws 1957, 1328, ch 724, § 1.

According to the minutes of the Senate Judiciary Committee for May 10, 1957, Senator Anthony Yturri asked Representative Shirley Field, one of the sponsors of that amendment, whether fraternal organizations would be included and she replied that "private clubs or institutions would not be covered."

In 1961, the definition of a "place of public accommodation" was again amended to read:

"(a) Any hotel, motel, motor court, trailer park or campground.

"(b) Any place offering to the public food or drink for consumption on or off the premises.

"(c) Any place offering to the public entertainment, recreation or amusement.

"(d) Any place offering to the public goods or services." Oregon Laws 1961, 301, ch 247, § 1.

According to testimony by E. Shelton Hill, Executive Director of the Urban League of Portland, at a hearing of the Senate State and Federal Affairs Committee on February 9, 1961, and others who testified at that time in support of that amendment, the purpose of adding subsection (d) was to end discrimination in health and beauty salons, barber shops and medical services.

The Public Accommodation Act was last amended in 1973 to include discrimination based upon sex and marital status and to define a "place of public accommodation" as:

"* * * *any place, or service* offering to the public accommodations, advantages, facilities or privileges whether in the nature of goods, *services,* lodgings, amusements or otherwise." (Emphasis added) ORS 30.675(1)

In view of plaintiff's contention that the legislature intended by this amendment to include such "services" as "the provision of scouting services" by an organization such as the Boy Scouts of America, the legislative history of this 1973 amendment is also of particular significance.

On March 2, 1973, Eleanor M. Meyers, Director of the Women's Equal Employment Opportunity Program in the Civil Rights Division of the Bureau of Labor testified to the House Committee on State and Federal Affairs that the 1973 amendment

"* * * including in the definition of a public accommodation 'any place offering to the public goods and services' would include literally all phases of *any business soliciting public patronage,* including the granting of the use of credit and financing and loan services which is one of the most widespread areas of discrimination based on sex." (Emphasis added)

To the same effect, it appears from the audio records of the March 2, 1973, meeting of the House

[ 333 ]

State and Federal Affairs Committee, that this question was specifically considered:

Unidentified Representative: "I'm not certain of the role that the YMCA and YWCA have taken, but would this [bill] in fact affect them? I presume they are segregated by sex?"

Eleanor Meyers: "Well, basically *they are private membership organizations.* I don't know whether there are any questions about their being distinctly private or not, but I think basically they are private organizations. Now where they open facilities for public accommodation without membership rights, that's another thing. But I believe most of them do. I believe that use of their facilities is open to people of both sexes. It is the *membership* that is not open on an equal basis."

Unidentified Representative: And *this [bill] wouldn't affect them?"*

Eleanor Meyers: "I don't believe it would as such. That's a question that needs further research. It depends on what services could be called distinctly private." (Emphasis added)

█ It would appear from the foregoing that the primary concern and purpose of the Oregon legislature in its enactment of the Oregon Public Accommodation Act was to prohibit discrimination by *business or commercial enterprises* which offer goods or services to the public.

This conclusion is also supported by the views expressed by the then Administrator of the Civil Rights Division of the Oregon Bureau of Labor in a summary of the Public Accommodation Act entitled "House Bill 2116 — 1973 Amendments to Laws Against Discrimination" and prepared shortly after passage of the 1973 Amendments.[3] There, the purpose of the amendment to the definition of a "place of public accommodation" was stated to be as follows:

"*Clarifies and simplifies* definition of place of public accommodation to read 'any place or service offering to

---

[3]For the text of that summary, see Oregon State Bar CLE, 1973 Legislation 186 (1973).

the public accommodations, advantages, facilities or privileges whether in the nature of goods, services, lodgings, amusements or otherwise.' *The legislative history is clear that this definition is intended to be a broad one and to apply to all types of businesses which offer goods and/or services to the public.* This includes the services of credit, financing mortgages, loans, and insurance as well as hotels, motels, retail sales, etc." (Emphasis added)

It may be true, as contended by plaintiff, that the Boy Scouts of America is not a "bona fide club or place of accommodation which is in its nature distinctly private," so as to come within the exemption provided by ORS 30.675(2) from compliance with provisions of the Oregon Public Accommodation Act. The same may also be true of the YMCA and YWCA.

If, however, as would appear from the legislative history of that Act, the Oregon legislature intended that services offered by the YMCA and YWCA would not be subject to the provisions of the act (with the possible exception of the operation of facilities for "public accommodation" without membership rights), it is difficult to see how the legislature could have intended any different application of that Act to the Boy Scouts of America.

The Boy Scouts of America has been chartered by Act of Congress as an organization for boys and is expressly exempt from federal laws relating to sex discrimination. 36 USC § 21 et seq.; 20 USC § 1681(a)(b). It may be, as stated by the dissent, that in spite of such statutes the Oregon legislature has the power to require such an organization to comply with Oregon statutes, including those relating to discrimination. It may also be true, as stated by the dissent, that similar statutes adopted by the legislatures of other states have been construed in such a manner as to be applicable to the Boy Scouts of America. We need not, however, decide those questions in this case, because the issue presented in this case is whether the Oregon legislature intended this statute to have such an application.

[ 335 ]

■ We are fully aware of the limitations which this court has recognized in considering, as a part of the legislative history of any statute, including this statute, statements made at committee hearings and statements made after the enactment of a statute.[4] In our opinion, however, the legislative history of the Oregon Public Accommodation Act, when taken as a whole, is sufficiently clear so as to compel the conclusion that the term "place of public accommodation," as defined by ORS 30.675, as amended in 1973, was not intended by the Oregon legislature to include the Boy Scouts of America, at least to the extent of requiring it to accept applications by girls for membership.[5]

It follows that plaintiff's complaint failed to allege facts sufficient to constitute a cause of action and that the trial court properly sustained a demurrer to that complaint.

Affirmed.

**DENECKE, C. J.,** specially concurring.

I specially concur to state a rule of statutory construction which I believe is preferable to that stated in the majority opinion.

The majority states:

"* * * The reason, in our view, is that the term 'place or service' is 'ambiguous,' at least in a legal sense, because the words 'place' and 'service' are general terms and the intended meaning of such words in any given

---

[4]See *Thompson v. IDS Life Ins. Co.,* 274 Or 649, 652-53, 549 P2d 510 (1976). Cf. 2A Sutherland Statutory Construction 203, 209-10, §§ 48.06 and 48.10 (4th ed Sands 1973). The weight to be accorded such legislative history is different in this case than in *Thompson,* where much better evidence of legislative intent was available in the form of other contemporaneous Oregon statutes.

[5]Because the decision by the trial court may be properly affirmed on this ground, it is not necessary for this court to consider the additional contentions by defendant to the effect that to interpret the Oregon Public Accommodation Act to cover it would render the statute unconstitutional and would violate constitutional Rights of Association as protected by the Constitution of the United States and the State of Oregon, as well as the Supremacy Clause of the Constitution of the United States, as also discussed by the dissent.

[ 336 ]

context may depend upon the intent with which such words were used. For that reason, this court may properly consider the legislative history of ORS 30.675 for the purpose of determining, if possible, the intent of the legislature in the use of that term." (Footnotes deleted.)

I prefer the rule as stated in *United States v. American Trucking Association,* 310 US 534, 543-544, 60 S Ct 1059, 84 L Ed 1345, rehr den 311 US 724, 61 S Ct 53, 85 L Ed 472 (1940):

"* * * When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.' * * *."

See Murphy, *Old Maxims Never Die: The "Plain-meaning Rule" and Statutory Interpretation in the "Modern" Federal Courts,* 75 Colum L Rev 1299 (1975).

**O'CONNELL, J.,** dissenting.

The majority holds that the plain thrust of the Public Accommodation Act is to bar discrimination in business and commercial activities. I find nothing in the Act nor in the legislative background of the Act which suggests that it was to apply only to business or commercial activities. The Oregon Public Accommodation Act is but one of a number of similar state statutes in the United States proscribing discrimination.[1] The Civil Rights Act of 1964 (42 USCA 2000a et seq.) appears to be aimed at essentially the same objective. These comparable statutes have, for the most part, been construed to extend to non-commercial types of

---

[1] *See, e.g.,* Ariz. Rev. Stat. Ann. § 41-1441; Iowa Code Ann. § 601 A.2(10); N. J. Stat. Ann. 10:1-5; N. M. Stat. Ann. § 4-33-1 et seq; N. Y. Exec. Law § 292(9) and N. Y. Civ. Rts. Law 40; 43 Consol. Pa. Stats. Ann. § 951 et seq; R. I. Gen. Laws Ann. § 11-24-3; Utah Code Ann. § 13-7-2(a); and Wash. Rev. Code § 9.91.010(1).

*See also,* additional Public Accommodation Acts collected in *Heart of Atlanta Motel v. United States,* 379 US 241, 85 S Ct 348, 13 L Ed2d 258, 259, n. 8 (1964).

discriminatory conduct. Thus, the statutes have been applied to preclude the practice of excluding females from competitive sports or to preclude the practice of withholding membership in the Y.M.C.A. from applicants because of their color.[2] There are also many cases raising an equal protection challenge to sex discrimination in school athletic programs.[3] Although this constitutional issue has not been raised in the present case, such cases are a fruitful source of analogy since they consider many of the issues present in Public Accommodation Act cases.

Defendant points to ORS 30.680, which permits the recovery of damages "from the operator or manager of such place" (of public accommodation), arguing that this phrase relates to the management of a commercial enterprise and not to one who performs such services as leading a group of young boys in Cub Scout activities. It may seem somewhat out of focus to refer to one performing *services* of any kind as the "operator or manager" of a "place." But it is to be noted that ORS 30.675 provides that a "place of public accommodation * * * means any place or service." ORS 30.680 must, therefore, be read to say that damages may be recovered from "the operator or manager of such place [or service]." If one can operate or manage a *service,* it is difficult to see why one cannot operate or manage a

---

[2] *See, e.g., Stout v. Young Men's Christian Ass'n.,* 404 F2d 687 (5th Cir 1968) and *Nesmith v. Young Men's Christian Ass'n of Raleigh, N.C.,* 397 F2d 96 (4th Cir 1968) (federal Civil Rights Act prohibited racial discrimination of Y.M.C.A.); *National Organization for Women, Essex Chapter v. Little League Baseball, Inc.,* 127 N J Super 522, 318 A2d 33, *aff'd. mem.,* 67 N J 320, 338 A2d 198 (1974) (state statute prohibited sex discrimination in Little League baseball program). *See also, Tillman v. Wheaton-Haven Recreation Ass'n.,* 410 US 431, 93 S Ct 1090, 35 L Ed2d 403 (1973) (federal Civil Rights Act prohibited racial discrimination in non-profit community swimming pool association).

[3] *See, e.g.,* cases collected in 19 S Dak L Rev 429 (1974), and in 25 Syracuse L Rev 535 (1974).

service which consists of teaching woodcraft, how to tie knots, or how to live in a Cub Scout camp.[4]

There is nothing about the wording of the Oregon Act which suggests that it was intended to be confined to commercial activities or to those activities which are carried on in a particular geographical place where goods, entertainment, services, etc. are dispensed to the public. Whether a nondiscrimination statute such as ORS 30.670 et seq. is to be given a limited application to accommodations, goods, services, etc. which are found in the marketplace or a broader and more inclusive interpretation will depend upon the objectives which motivated the adoption of this type of legislation.

The original public accommodation acts sought to deter discrimination on the basis of "race, religion, color, or national origin."[5] More recently, discrimination on the basis of sex or marital status is forbidden.[6] The evil at which this type of legislation is aimed is not simply the unfairness which results in denying certain material benefits to one group when they are at the same time made available to others; it is aimed at the elimination of practices which deprive a person of his individuality by insisting that he bear the stamp of his class. As Kenneth Karst observes, in an article in 49 Los Angeles Bar Bulletin 499, 502 (Oct. 1974),

---

[4]It is likely that some of the terminology and the thrust of the language in some parts of the Oregon Public Accommodation Act does not fit comfortably in other parts of the Act because of the amendments made to the Act by Oregon Laws 1973, ch 714. It will be noted that in making these amendments the legislature eliminated the specific designation of "place" (*e.g.,* "hotel, motel, motor court, trailer park, or campground)," and "[a]ny place offering to the public food or drink" and "[a]ny place offering to the public entertainment, recreation or amusement" and "[a]ny place offering to the public goods or services," and substituted the *general* definition of a place of public accommodation as "any place or service offering to the public accommodations, advantages, facilities or privileges whether in the nature of goods, services, lodgings, amusements or otherwise," obviously in an effort to expand the scope of the statute.

[5]*E.g.,* Oregon Laws 1953, ch 495, § 1.

[6]*E.g.,* Oregon Laws 1973, ch 714.

entitled "A Discrimination So Trivial": A Note on Law and the Symbolism of Women's Dependency:

"* * * It is state sponsorship of the symbolism of * * * inferiority that is unconstitutional.

"Inequality is harmful *chiefly* in its impact on the psyches of the disadvantaged. * * * [W]hat really matters about inequality is something that happens inside our heads:

" 'The peculiar evil of a relative deprivation * * * is psychic or moral; it consists of an affront; it is immediately injurious insofar as resented or taken personally, and consequentially injurious insofar as demoralizing.' "[7]

The psychic or moral interest at stake is seen in the principle that provision for separate but equal accommodations does not obviate a constitutional objection based on the Equal Protection Clause of the Fourteenth Amendment.[8] It is apparent that the so-called "women's lib" movement is not merely an expression of dissatisfaction on the part of women because goods and services are not made available to them to the same extent that they are available to men. They seek to eliminate the traditional image of women's dependence and their relegation to certain traditional female roles.[9]

---

[7] The quote is from Michelman, "On Protecting the Poor Through the Fourteenth Amendment," 83 Harv L Rev 7, 49 (1969).

[8] *See, Brown v. Board of Education,* 347 US 483, 74 S Ct 686, 98 L Ed 873, 38 ALR2d 1180 (1954) (public school) and *Watson v. Memphis,* 373 US 526, 83 S Ct 1314, 10 L Ed2d 529, 538 (1963) (public recreational facilities).

[9] The proponents of this view do not contend that a classification based upon sex can never be employed, but only that it cannot be employed without justifying it on the basis of some compelling societal interest. As Karst notes: "Of course, law — any law — implies inequality. Inequality is built into a system of norms and sanctions; legislation necessarily classifies. And law, at least law-as-rules, is necessarily a system of symbols. Some symbolism of inequality is thus inescapable if we are to have law. A legal system constitutionally disabled from employing any such symbolism is a legal system that cannot function. However, no such self-defeating remedy is required. What is required is a special judicial sensitivity to the impact of legislative symbolism on any person's sense of first-class citizenship, on any person's sense of individuality, independence and self-worth. Doctri-

It is no answer to a high school girl who seeks to be accepted as a member of the varsity tennis team that the tennis facilities for women are as good or better than those enjoyed by the boys who play on varsity; she demands recognition as an individual — the opportunity to demonstrate that whatever image her sex may denote as a result of tradition, she *as an individual* can do as well as the males who have excluded her.

Reading the Oregon Public Accommodation Act against this backdrop, which relates the 1973 amendment of the Act to the movement for women's psychological independence, I cannot accept the majority's narrow interpretation of the Act, limiting it to commercial activities or to material advantages such as the obtention of credit.

The majority's attempt to derive "legislative intent" from a few oblique comments by witnesses at the committee hearings speculating about the applicability of the legislation is unproductive. For example, the testimony of Eleanor Meyers is relied upon by the majority in support of the conclusion that the YMCA and YWCA (and therefore the Boy Scouts of America) are not within the definition of "public accommodations." Apart from the fact that the witness' statements are ambiguous and inconclusive, they seem clearly in error.[10] It is difficult to believe that such testimony would convince the legislature that the YMCA, YWCA or similar organizations, including

nally speaking, such sensitivity is conveniently expressed in the notion that classification on the basis of sex is 'suspect' requiring justification by a compelling state interest." Karst, "A Discrimination So Trivial": A Note on Law and the Symbolism of Women's Dependency, 49 Los Angeles Bar Bulletin 499, 504 (Oct. 1974).

[10]In *Thompson v. IDS Life Ins. Co.,* 274 Or 649, 652, 549 P2d 510, decided as recently as April 15, 1976, this court dismissed the *same* statement of Eleanor Meyers that is relied upon by the majority in the present case: "* * * [I]t is only the comment of one individual and of little or no help in determining legislative intent."

Boy Scouts, were "strictly private" organizations. The effect of the majority's interpretation is that the statute would not be violated if the YMCA would exclude from membership all black persons. I cannot bring myself to believe that the legislature intended the statute to permit discrimination in such circumstances. If I am correct in my belief, there is as much reason to assume that discrimination on the basis of sex as well as on the basis of color was proscribed.

The majority's reliance on the testimony of Eleanor Meyers is faulty in another respect. The following portion of Eleanor Meyers' statement quoted by the majority indicates that the YMCA and YWCA would be included under the 1973 Act definition of public accommodations *unless* the "distinctly private" exception applied:

> Unidentified Representative: "*and this [bill] wouldn't affect them* [YMCA and YWCA]?
>
> Eleanor Meyers: "I don't believe it would as such. That's a question that needs further research. It depends on what services would be called distinctly private."

This is inconsistent with the majority's conclusion that the legislature intended the public accommodations act to apply to only business or commercial enterprises.

The same inconsistency exists in the majority's use of Representative Shirley Field's 1957 testimony. When asked whether the Act would include fraternal organizations, Representative Field replied, "private clubs or institutions would not be covered." Representative Field did not mention the non-commercial nature of most fraternal organizations. The recurring distinction in the legislative history is between that which is a public accommodation and that which is "distinctly private"; it is not the distinction between commercial and non-commercial relied upon in the majority opinion.[11]

---

[11] Since its inception, the Public Accommodation Act has always contained a "distinctly private" exception: *See,* 1953 Oregon Laws, ch 495, § 2; 1957 Oregon Laws, ch 724, § 2; 1961 Oregon Laws, ch 247, § 2; 1973 Oregon Laws, ch 714.

Defendant also contends that even if defendant was found to be a "place" or provided a "service" within the meaning of the Act, it falls within the exception found in ORS 30.675, which excludes "any institution, bona fide club or place of accommodation which is in its nature distinctly private."

Since the Boy Scouts of America organization does not appear to be a club as that term is usually employed, the question is whether defendant is an "institution" or "place of accommodation which is in its nature distinctly private."[12] Although no evidence was adduced in the present case (since it was decided upon the demurrer to the complaint), it is commonly known that membership in the Boy Scouts of America is open to any boy within the specified age group without any other limitation whatsoever. It is also a matter of common knowledge that defendant obtains its financial support from public sources.[13] To classify as "distinctly private" an organization with such open accessibility to the public at large (within the age group) and with its financial support resting on such a broad public base, would be to distort this phrase beyond any conceivable meaning which could be attributed to the drafter.

A point is made of the fact that the extension of membership in the Boy Scouts would require defendant and other similar organizations such as the Girl Scouts, the Camp Fire Girls, and the Young Women's Christian Association either to restructure their programs and some of their physical facilities at consider-

---

[12]There are numerous cases in which the courts have been called upon to decide whether a *club* is or is not "distinctly private." In making this determination the factors employed have included: (1) Whether the club is genuinely selective; (2) whether the members control the organization; (3) whether the club is supported solely by its members; (4) whether there are initiation fees and dues; (5) whether payment for the privilege of membership or "dues" is by cash or credit; (6) whether it advertises; (7) whether it is taxed and licensed as a private club; (8) whether the use of its facilities is limited to members and their guests.

[13]Public sources of financial support include United Way, Inc. (a community fund raising organization) and, in some instances, have included federal education programs (*cf.,* USCS § 1681(a)(6)(B)).

able inconvenience or to withdraw from the state. It is further argued that the union of both sexes in any of these organizations would result in sacrificing the special benefits now offered to the youth of a single sex. Recited as another reason for limiting the membership as presently provided is the prospect of supporters of the existing programs withdrawing their contributions.

It is highly doubtful that this spectre of a crumbling organization would assume real form. It is well known that in many communities YMCA and YWCA organizations continue to flourish even though membership in each case is open to both sexes (as well as to young and old and to Christian and non-Christian). But even assuming serious readjustments would be necessary if the Act is interpreted as requiring the acceptance of both sexes in the organization, I do not regard this as a basis for holding the statute inapplicable. The same considerations which apply in testing the constitutionality of a statute alleged to deprive the plaintiff of equal protection are applicable in testing the statute involved here. Frequently, in the equal protection cases, compliance with the court's command to desist from discrimination causes serious, and sometimes costly, readjustments. This is a part of the price we pay for the equality guaranteed by the constitution. I assume that the legislature recognized that a similar price would have to be paid to remove existing disparities which did not meet the requirements of the statute.

Upon the basis of the foregoing reasons, I would hold that the allegations of plaintiff's complaint bring this case within the scope of the Public Accommodation Act and therefore defendant's demurrer should have been overruled.

The question which has been presented to the court on this appeal: "Did the legislature intend the Public Accommodation Act to proscribe the exclusion of girls from the Boy Scouts of America?" will, for some,

undoubtedly have the ring of facetiousness. If the inquiry is made simply in terms of the right of a specific female person to enjoy the benefits which are offered by the Boy Scouts program, the obvious answer is that she can get similar benefits by joining the Girl Scouts, the Camp Fire Girls, or the Brownies. But this "separate but equal" argument loses its force if the specific female applicant is seen as the prototype of all women and the defendant's refusal to admit her as a rejection of all women simply because they fall within a particular class. The interest at stake, then, assumes the form which I have identified above — the interest which relates to one's sense of individuality, independence and self-worth.[14] That interest is easier to identify when it is put alongside the interest protected where color is the basis of the discrimination. If defendant were to set up a Boy Scout program exclusively for blacks and barred them from a separate organization for whites, it would be obvious that the classification would be discriminatory. The reason that the classification is discriminatory is that each black person is entitled to be treated as a person and the classification fails to do this. The interest involved is described by Morris, "Persons and Punishment," 52 The Monist 475, 493 (1968), as follows:

> "The right to be treated as a person is a fundamental right belonging to all human beings by virtue of their being human. It is also a natural, inalienable and absolute right."

To this, Karst adds:

> "* * * It is more basically the right to be treated as one who is free to make independent choices. It is this sense of being a person that is undermined by legal rules symbolizing a woman's dependency."[15]

---

[14] "This right to be treated as a person is a fundamental right belonging to all human beings * * *." Morris, "Persons and Punishment," 52 The Monist 473, 495 (1968).

[15] K. Karst, "A Discrimination So Trivial": A Note on Law and the Symbolism of Women's Dependency, 49 Los Angeles Bar Bulletin 499, 503, n. 22 (Oct. 1974).

When this is seen as the interest intended to be protected by the Public Accommodation Act it becomes apparent that it becomes necessary to subordinate other interests in order to fulfill the purpose of the Act. Thus, although one may feel strongly that, as a parent, he should be entitled to have his son learn the principles of scouting in exclusively male surroundings, that luxury cannot be enjoyed where the scouting program is offered as a public accommodation. There is, of course, nothing to prevent the creation of a strictly private organization offering a scouting program for boys only.[16]

If all of this has a strange and unreal ring to it, the explanation is that the symbolism of women's dependency has by tradition been so deeply ingrained in our thinking that it is difficult to readjust our views to comport with the growing recognition of woman's equality and independence.

Defendant argues that a construction of the Act requiring the acceptance of girls into the Boy Scouts would violate the right of association guaranteed by Article I, § 26 of the Oregon Constitution and the First and Fourteenth Amendments of the United States Constitution. The "governing principle," defendant asserts, is found in the following dissenting opinion of Mr. Justice Douglas in *Moose Lodge No. 107 v. Irvis,* 407 US 163, 92 S Ct 1965, 32 L Ed2d 627, 641 (1972):

"* * * The associational rights which our system honors permit all white, all black, all brown, and all yellow clubs to be formed. They also permit all Catholic, all Jewish, or all agnostic clubs to be established. Government may not tell a man or woman who his or her associates must be. The individual can be as selective as he desires. So the fact that the Moose Lodge allows only Caucasians to join or come as guests is constitutionally

---

[16]Nor would there seem to be a violation of the Act if in addition to offering one public accommodation program open to both boys and girls, a separate program was offered for boys and a separate program offered for girls.

irrelevant, as is the decision of the Black Muslims to admit to their services only members of their race."

Taking this literally as a "governing principle," the most flagrant form of discrimination would be protected under the mantle of the right of free association. The answer is, of course, that those with a common interest may associate exclusively with whom they please only if it is the kind of association which was intended to be embraced within Art. I, § 26, Oregon Constitution and the First and Fourteenth Amendments of the United States Constitution.

These constitutional provisions were not intended to restrain the legislature from enacting anti-discrimination laws where, as in the case of the Oregon Public Accommodation Act, strictly private institutions are not affected.[17]

Defendant also argues that the enforcement of the Public Accommodation Act against the Boy Scouts of America would violate the Supremacy Clause of the United States Constitution, Art. VI, Cl. 2.[18] It is pointed out that the Boy Scouts of America, the Girl Scouts of America, and similar organizations have been granted charters by Act of Congress (36 USCA § 21 et seq.). Defendant interprets this as a declaration of policy that the precepts and goals of the Boy Scouts of America can best be encouraged by participation in

---

[17]The right to freedom of association is not absolute. *See,* Annotation, 33 L Ed2d 865 §§ 6[a] and 7[b], and cases collected therein. States may constitutionally limit associational freedoms in furtherance of a compelling state interest in the regulation of a subject within the state's power to regulate, so long as the compelling interest cannot be served equally well through significantly less burdensome regulation. *See, American Party of Texas v. White,* 415 US 767, 94 S Ct 1296, 39 L Ed2d 744, 760 (1974). The Oregon Public Accommodation Act is in furtherance of a compelling state interest within the state's power to regulate—elimination of the evils inherent in discrimination on the basis of race, sex, religion, marital status or national origin—and the regulation could not be made significantly less burdensome and still serve the state interest equally well.

[18]"This Constitution, and the Laws of the United States which shall be made in Pursuance thereof * * * shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

[ 347 ]

programs limited to persons of the same sex. Assuming that Congress has the power to so limit the method by which such programs are to be carried out,[19] there is no indication that Congress intended to authorize Boy Scouts to practice sex discrimination in violation of state law. In fact, the language of the Boy Scouts charter demonstrates a contrary intent:

> "The name of the corporation created by this chapter shall be 'Boy Scouts of America', and by that name it shall have * * * power to * * * make and adopt by-laws, rules, and regulations *not inconsistent with the laws of the United States of America, or any State thereof * * *.*" 36 USCA § 22. (Emphasis added.)

There is no Supremacy Clause problem, since Congress did not authorize Boy Scouts to exclude girls if to do so would be inconsistent with state law.[20]

---

[19] In *National Organization for Women, Essex Chapter v. Little League Baseball, Inc.,* 127 N J Super 522, 318 A2d 33, 40 (1974), the defendant argued that since Little League Baseball, Inc. was chartered by Congress, it precluded inconsistent state legislation. The court stated:

"* * * Moreover, the ascription of any purpose or policy beyond the mere grant of a federal charter would be incompatible with Congress' limited power to create corporations.

"Congress has no explicit power to create corporations. The power exists only as a means, under the necessary and proper clause, to effectuate the powers expressly conferred upon the national government. M'Culloch v. Maryland, 4 Wheat. 316, 4 L. Ed. 579 (1819); see Fletcher, Cyclopedia Corporations, § 121 (1963). Since it is difficult to conceive of any express power underlying the congressional charter of incorporation for Little League Baseball, the charter is itself a tenuous exercise of federal power. Moreover, there being no underlying express power, the charter cannot be deemed intended to effectuate any substantive policy or purpose.

"These being our views as to the intent and purpose of the chartering act, it remains to determine whether the Law Against Discrimination, as applied in the Division, conflicts with it. The test is whether the latter 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' Hines v. Davidowitz, 312 US 52, 67-68, 61 S Ct 399, 404, 85 L Ed 581 (1941) quoted with approval in Perez v. Campbell, supra, 402 US at 649-650, 91 S Ct at 1711; Florida Avocado Growers v. Paul, 373 US 132, 141 (opinion of the court), 165 (dissenting opinion), 83 S Ct 1210, 10 L Ed2d 248 (1963)."

[20] *See, Florida Avocado Growers v. Paul,* 373 US 132, 83 S Ct 1210, 10 L Ed2d 248, 257 (1963). Federal regulation is not "deemed preemptive of state regulatory power in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained. * * *"

The decision of the trial court should, therefore, be reversed and remanded for trial.