Argued and submitted November 3, 2021, resubmitted January 25; certified question answered June 3, 2022

Andrew ABRAHAM,
on behalf of himself,
and for all others similarly situated,
*Plaintiff-Appellant,*

*v.*

CORIZON HEALTH, INC.,
fka Prison Health Services, Inc.,
*Defendant-Appellee.*

(United States Court of Appeals for the Ninth Circuit
No. 19-36077) (SC S068265)

511 P3d 1083

Plaintiff, a deaf individual with diabetes who was held in the Clackamas County Jail, alleged that defendant, a private company providing medical services at the jail, unlawfully placed him on suicide watch and denied him meals and access to insulin in violation of Oregon law when it failed to use an American Sign Language interpreter to communicate with plaintiff. Plaintiff sued defendant in federal district court under ORS 659A.142(4), which prohibits disability discrimination by places of "public accommodation." The district court dismissed plaintiff's claim, concluding that defendant was not a place of public accommodation as defined by ORS 659A.400. Plaintiff appealed to the Ninth Circuit, which certified to the Oregon Supreme Court the following question: "Is a private contractor providing healthcare services at a county jail a 'place of public accommodation' within the meaning of Oregon Revised Statutes § 659A.400 and subject to liability under § 659A.142?" *Held*: (1) Plaintiff was a "customer" or "patron" of defendant within the meaning of ORS 659A.142; (2) a private contractor providing healthcare services at a county jail is a "place of public accommodation" within the meaning of ORS 659A.400(1) and can be subject to liability under ORS 659A.142; (3) a private contractor providing healthcare services at a county jail does not qualify for the exclusion of a "local correction facility" from the definition of public accommodation found in ORS 659A.400(2)(d).

The certified question is answered.

On certified question from the United States Court of Appeals for the Ninth Circuit; certification order dated January 28, 2021; certification accepted March 4, 2021.

Carl Post, Law Offices of Daniel Snyder, Portland, argued the cause and filed the brief for plaintiff-appellant. Also on the brief was John Burgess.

Sara Kobak, Schwabe, Williamson & Wyatt, PC, Portland, argued the cause and filed the brief for defendant-appellee. Also on the brief was Anne M. Talcott.

Shenoa Payne, Shenoa Payne Attorney at Law PC, Portland, filed the brief for *amicus curiae* Oregon Trial Lawyers Association.

Daniel Greenfield, Kathrina Szymborski, and Brad Sukerman, Roderick and Solange MacArthur Justice Center, Chicago, Illinois, and Washington, D.C., and Aliza B. Kaplan, Criminal Justice Reform Clinic, Lewis & Clark Law School, Portland, filed the brief for *amici curiae* Disability Rights Oregon, Lewis & Clark Law School's Criminal Justice Reform Clinic, and American Civil Liberties Union of Oregon.

Before Walters, Chief Justice, and Balmer, Flynn, Duncan, Nelson, Garrett, and DeHoog, Justices.*

WALTERS, C. J.

The certified question is answered.

Garrett, J., dissented and filed an opinion, in which Balmer, J., joined.

_____
* Nakamoto, J., retired December 31, 2021, and did not participate in the decision of this case.

**WALTERS, C. J.**

In this opinion, we answer a question that has been certified to us by the United States Court of Appeals for the Ninth Circuit, concerning the applicability of Oregon's anti-discrimination laws to a private contractor that provides healthcare services within a jail. Plaintiff filed a lawsuit against defendant, a private entity that contracted with the Clackamas County Jail to provide healthcare services to incarcerated persons, alleging that defendant had discriminated against him on the basis of disability, in violation of ORS 659A.142(4), which prohibits disability discrimination by places of public accommodation. The district court held that defendant was not a place of public accommodation, as defined by ORS 659A.400. The Ninth Circuit asked us to help it to resolve plaintiff's appeal of the dismissal of his state law claim and certified to us the following question:

> "Is a private contractor providing healthcare services at a county jail a 'place of public accommodation' within the meaning of Oregon Revised Statutes § 659A.400 and subject to liability under § 659A.142?"

As we explain below, the answer to that question is yes.

## BACKGROUND

We take the following summary of the factual background and procedural posture of the case from the Ninth Circuit's certification order and from the record. Because the question certified to us arises from the appeal of the dismissal of plaintiff's complaint, we, like the Ninth Circuit, assume that the facts alleged in the complaint are true. *See Abraham v. Corizon Health, Inc.*, 985 F3d 1198, 1199-200 (9th Cir 2021) ("Because the district court decided this case on a motion to dismiss, we assume the truth of the facts as set out in the complaint.").

Plaintiff is deaf and prefers to communicate through American Sign Language (ASL), which is his primary language. Plaintiff's ability to communicate in English is more limited. In October 2015, plaintiff was arrested and taken to the Clackamas County Jail. Based on communications with plaintiff without the assistance of an ASL interpreter, a deputy incorrectly flagged plaintiff as being a suicide risk.

As a result, plaintiff was placed on suicide watch. Defendant has a contract with Clackamas County to provide medical and mental health services at the jail and was responsible for plaintiff's care and for further assessment. Over the course of three days, defendant's staff was unable to communicate effectively with plaintiff but failed to provide an ASL interpreter. As a result of defendant's staff's misunderstandings, plaintiff, who is diabetic, was denied meals and access to insulin. Also, as a result of defendant's inability to communicate with plaintiff, plaintiff remained on suicide watch for three days.

Plaintiff filed suit against defendant in federal district court alleging, among other claims, that defendant was a "place of public accommodation" that had discriminated against him because he is "an individual with a disability," in violation of ORS 659A.142(4). Plaintiff initially sought only equitable relief, and the district court dismissed the claim on standing grounds because plaintiff was no longer incarcerated. In the order that is the basis for plaintiff's current appeal, the district court denied plaintiff's motion to amend his complaint to add a claim for compensatory damages on the grounds that the amendment would be futile. The district court concluded that defendant was not a "place of public accommodation," as defined by ORS 659A.400(1)(a), meaning that ORS 659A.142(4) did not apply to defendant's provision of medical services in a jail setting.

Plaintiff appealed to the Ninth Circuit, arguing that the district court had construed the statutory term "public accommodation" too narrowly and asking the Ninth Circuit to certify that question of state law to this court. In response, defendant both disputed plaintiff's interpretation of ORS 659A.400(1)(a) and argued that ORS 659A.142 was inapplicable to plaintiff's case for a second reason: Plaintiff was neither a "customer" nor "patron" of defendant's services.

The Ninth Circuit reviewed Oregon case law interpreting ORS 659A.400(1)(a) and, noting that "Oregon courts have yet to address whether a private contractor like [defendant] constitutes a 'place of public accommodation,'" expressed uncertainty about whether Oregon courts would conclude that defendant meets the definition. *Abraham*,

985 F3d at 1202. The Ninth Circuit likewise noted that no Oregon case addresses whether ORS "659A.142(4)'s use of the terms 'customer or patron' excludes plaintiffs like" plaintiff. *Id.* Rather than decide those questions of state law itself, the Ninth Circuit certified the following question to this court:

> "Is a private contractor providing healthcare services at a county jail a 'place of public accommodation' within the meaning of Oregon Revised Statutes § 659A.400 and subject to liability under § 659A.142?"

*Abraham*, 985 F3d at 1199. We accepted the certified question.

## ANALYSIS

We understand the certified question to present several distinct, though related, issues of statutory construction. The first question is whether plaintiff was a "customer" or "patron" of defendant's services. Defendant has not renewed that argument in its briefing before this court; nevertheless, we understand the Ninth Circuit's certification order to encompass that question, which must be resolved in plaintiff's favor for defendant to be "subject to liability under [ORS] 659A.142." The second question for our consideration, assuming that we decide the first question in plaintiff's favor, is whether defendant qualifies as a "place of public accommodation," as that term is defined in ORS 659A.400. Resolving that dispute, however, itself involves two distinct questions: whether defendant meets the general definition of a public accommodation contained in ORS 659A.400 (1)(a) and, if so, whether defendant falls into an exclusion from that definition for "local correction facilit[ies]," contained in ORS 659A.400(2)(d). To answer each of those questions, we employ our ordinary approach to statutory construction, considering text and context together with any legislative history that we might find helpful. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009).

We begin by addressing whether plaintiff qualifies as a "customer or patron" of defendant's services. That question is made relevant by the wording of ORS 659A.142(4), the statutory basis of plaintiff's claim against defendant:

"It is an unlawful practice for any place of public accommo-
dation, resort or amusement as defined in ORS 659A.400,
or any person acting on behalf of such place, to make any
distinction, discrimination or restriction because a cus-
tomer or patron is an individual with a disability."

ORS 659A.142(4). To state a claim under ORS 659A.142(4),
plaintiff must therefore show that he was a "customer or
patron" who was subjected to "any distinction, discrimina-
tion or restriction" by defendant or its agents because he "is
an individual with a disability."

Before the Ninth Circuit, defendant argued that "an
involuntarily detained inmate in a jail is not a 'customer' or
'patron' of jail services in the ordinary sense of purchasing
or seeking out those medical services." Defendant relied on
*Fenimore v. Blachly-Lane County C.E.A.*, 297 Or App 47, 59,
441 P3d 699 (2019), where the Court of Appeals held that a
plaintiff who could neither actually nor potentially use the
defendant's services did not qualify as a patron or customer.[1]

Responding to that argument, plaintiff argues that
all that is required for a plaintiff to be a "patron or cus-
tomer" is that the plaintiff use the defendant's services. He
argues that the ordinary meaning of those terms does not
restrict the coverage of ORS 659A.142(4) to individuals with
disabilities who personally pay for the services that they
use.

Before turning to the text, we first clarify the pre-
cise question before us. We do not need to decide, in this case,
whether plaintiff would qualify as a customer or patron of
the Clackamas County Jail. Defendant is not the jail; rather,
it is a separate entity that provides a set of services to people
in the jail's custody. Defendant's argument is that, because
plaintiff has not alleged that he personally paid for those

---

[1] *Fenimore* concerned a claim against a private electric cooperative by a
plaintiff who did not and—because she lived outside of the service area of the
cooperative—could not purchase energy or receive other services from the defen-
dant. 297 Or App at 48-49. The basis of the plaintiff's claim was that a meeting
that she attempted to attend as a guest was not wheelchair accessible. *Id*. The
Court of Appeals held that, because the "plaintiff was not capable of patronizing
or purchasing services from the cooperative," she was not a patron or customer.
*Id*. at 59-60. The rationale behind the decision in *Fenimore* is not implicated here,
because plaintiff could and did use defendant's services.

services, or because he had no choice but to receive defendant's services, he does not qualify as a "patron" or "customer" within the ordinary meaning of those terms.

Unlike "place of public accommodation," neither "customer" nor "patron" is a statutorily defined term in the context of ORS 659A.142.[2] As a result, we begin our inquiry into their ordinary meanings by looking to the pertinent dictionary definitions. "Customer," as relevant here, is defined as

> "**a :** one that purchases some commodity or service <she had never seen that ~ before>; *esp :* one that purchases systematically or frequently * * * **b :** one that patronizes or uses the services (as of a library, restaurant, or theater) **:** CLIENT[.]"

*Webster's Third New Int'l Dictionary* 559 (unabridged ed 2002). "Patron," in its relevant sense, is defined as

> "a steady or regular client: as **a :** an habitual customer of a merchant **b :** a regular client of a physician **c :** a parent or guardian of a child in a private school **d :** one who uses the services of a library and esp. of a public library[.]"

*Id.* at 1656.

Those dictionary definitions provide little support for defendant's argument that plaintiff does not meet the requirements of the statute. Although one subsense of "customer" does refer to the *purchase* of a service, the coordinate subsense suggests that simply using a service may be enough to be considered a customer. And although the term "patron" may connote regularity, it is not defined to exclude the use of services that are free or for which there may be no ready alternative. Defendant's argument rests only on what defendant perceives to be the "ordinary sense" of those words and points to nothing in the context or legislative

---

[2] The term "customer" is defined by ORS 659A.411(1) as "an individual who is lawfully on the premises of a place of public accommodation." However, that definition expressly applies only to ORS 659A.411 to 659A.415, not to ORS 659A.142. In addition, that definition was enacted well after ORS 659A.142, and we do not believe that it sheds light on what an earlier legislature meant by the word "customer" in a different part of chapter 659A. *See* Or Laws 2009, ch 415, § 1 (creating ORS 659A.411); Or Laws 1973, ch 660, § 7 (enacting what is now ORS 659A.142, including the terms "customer" and "patron").

history of ORS 659A.142(4) that would suggest that the legislature intended to deny protection from discrimination to a person who had no choice but to use a particular service or to a person who uses services paid for by someone else. Because plaintiff falls within the ordinary meaning of the word "customer," we reject defendant's argument.

We now turn to whether defendant qualifies as a place of public accommodation. As noted above, for defendant to be liable under ORS 659A.142(4), it must be a "place of public accommodation, resort or amusement as defined in ORS 659A.400" or a "person acting on behalf of such [a] place." ORS 659A.400 defines a place of public accommodation, for purposes of both ORS 659A.142(4) and ORS 659A.403, which prohibits discrimination in such places on the basis of "race, color, religion, sex, sexual orientation, gender identity, national origin, marital status or age." In full, ORS 659A.400 provides:

"(1)   A place of public accommodation, subject to the exclusions in subsection (2) of this section, means:

"(a)   Any place or service offering to the public accommodations, advantages, facilities or privileges whether in the nature of goods, services, lodgings, amusements, transportation or otherwise.

"(b)   Any place that is open to the public and owned or maintained by a public body, as defined in ORS 174.109, regardless of whether the place is commercial in nature.

"(c)   Any service to the public that is provided by a public body, as defined in ORS 174.109, regardless of whether the service is commercial in nature.

"(2)   A place of public accommodation does not include:

"(a)   A Department of Corrections institution as defined in ORS 421.005.

"(b)   A state hospital as defined in ORS 162.135.

"(c)   A youth correction facility as defined in ORS 420.005.

"(d)   A local correction facility or lockup as defined in ORS 169.005.

"(e)   An institution, bona fide club or place of accommodation that is in its nature distinctly private."

As noted above, to resolve whether an entity is a place of public accommodation, we must first consider whether it meets any of the definitions contained in ORS 659A.400(1) and then whether it qualifies for any of the exceptions in ORS 659A.400(2). Although those questions are not unrelated—because each of the provisions of ORS 659A.400 may be relevant context for interpreting the others—they are nevertheless distinct and require separate analyses.

We begin with whether defendant qualifies as a place of public accommodation under ORS 659A.400(1). Plaintiff does not argue that defendant falls under the definitions found in ORS 659A.400(1)(b) and (c), which apply to public bodies, so the proper focus of our initial inquiry is ORS 659A.400(1)(a). Under that provision, there is no dispute that defendant's medical services fall within the expansive ambit of the phrase "advantages, facilities or privileges whether in the nature of goods, services, lodgings, amusements, transportation or otherwise." ORS 659A.400(1)(a). Rather, the question is whether defendant offers those services "to the public."

Defendant argues that it does not, contending that the general test should be whether "the place or service generally is accessible or available to the general public on an indiscriminate or unscreened basis." Defendant therefore argues that it is not a place of public accommodation because "jail services for prisoners are not held out as open or offered to the general public, or any subset of the general public, in any way."

We do not see the answer as quite that straightforward. In part, defendant's argument turns on a contention that people incarcerated in a jail are not part of the "public" at all, for purposes of ORS 659A.400. Or, as defendant puts it, that "[p]risoners also are segregated from the general public, rather than a subset of the general public." We cannot agree with that premise. Under Oregon law, even a person who has been convicted of a felony,

"[e]xcept as otherwise provided by law, *** does not suffer civil death or disability, or sustain loss of civil rights or forfeiture of estate or property, but retains

all of the rights of the person, political, civil and otherwise, including, but not limited to, the right *** to maintain and defend civil actions, suits or proceedings."

ORS 137.275. And jails frequently house individuals who, like plaintiff, have not been convicted of any crime. Because the people imprisoned in the Clackamas County Jail have not lost their rights under Oregon's antidiscrimination laws, it would make little sense to discount them from our understanding of the term "public" as that word is used in ORS 659A.400(1)(a).

Instead, we understand the primary dispute between plaintiff and defendant to come down to how broadly a service needs to be offered before it can be said to be offered "to the public," as that term is used in ORS 659A.400(1)(a). Plaintiff takes the position that a service offered only to a subset of the public qualifies as being offered "to the public," whereas defendant contends that the service must be offered to the "general public on an indiscriminate or unscreened basis."

Defendant's argument is not without some textual support. The word "public" is defined, in the senses that seem most relevant here, as

"**2 a :** an organized body of people **:** COMMUNITY, NATION *** **b :** the people as a whole **:** POPULACE, MASSES *** **3 :** a group of people distinguished by common interests or characteristics[.]"

*Webster's* at 1836. As can be seen, the word "public" can readily be used to refer to the entire populace, such that offering services "to the public" could mean, as defendant contends, services offered to everyone on an "indiscriminate or unscreened basis." But the word "public" does not always take on a scope that expansive. As the above definitions show, the word "public" can also refer more narrowly to a particular community or to a smaller group. The same dichotomy is present in *Black's Law Dictionary*'s definition of the term at the time that "to the public" was added to what is now ORS 659A.400. The word "public" may mean, "[i]n one sense, everybody," but, "[i]n another sense[,] the word does not mean all the people, nor most of the people, nor very many of the people of a place, but so many of

them as contradistinguishes them from a few." *Black's Law Dictionary* 1393 (4th ed 1951). As a result, the use of the word "public" alone does not tell us how broadly defendant's services must be offered for it to qualify as a place of public accommodation.

At minimum, it is clear from context that, whatever the meaning of "to the public," a service provider cannot escape the reach of ORS 659A.400(1)(a) simply by restricting its coverage on a basis prohibited by ORS 659A.403³ or ORS 659A.142(4)—a restaurant cannot argue that it does not provide services to the public because it hangs a "whites only" sign in the window. To hold otherwise would essentially nullify ORS 659A.403. But defendant does not dispute that point, and, on its own, it offers little guidance as to the kinds of restrictions in clientele, beyond those restrictions prohibited by Oregon law, that are compatible with a service nonetheless being considered a place of public accommodation.

One contextual cue favors reading ORS 659A.400 (1)(a) to encompass businesses that offer goods or services on a somewhat restricted basis. Since the enactment of what is now ORS 659A.400(1)(a) in 1961, it has been paired with an exception now found in ORS 659A.400(2)(e)⁴ for "[a]n institution, bona fide club or place of accommodation that is in its nature distinctly private." Defendant's understanding of ORS 659A.400(1)(a) would not only render ORS 659A.400 (2)(e) superfluous but would leave a massive gulf between the coverage of ORS 659A.400(1)(a) and the exclusion. Because any meaningful qualification on who can access a service would, on defendant's view, exclude it from the definition of a public accommodation, the question whether a place of public accommodation was "in its nature distinctly private" would not come close to mattering.

We have addressed ORS 659A.400 once before, in *Schwenk v. Boy Scouts of America*, 275 Or 327, 551 P2d 465

---

³ ORS 659A.403(1) prohibits discrimination in places of public accommodation "on account of race, color, religion, sex, sexual orientation, gender identity, national origin, marital status or age if the individual is of age, as described in this section, or older."

⁴ As we discuss below, the other exceptions in ORS 659A.400(2) were added in a 2013 bill that did not amend ORS 659A.400(1)(a), so they are therefore less helpful to understanding what that provision means. Or Laws 2013, ch 429, § 1.

(1976). In that case, we confronted a suit against the Boy Scouts of America brought by a young girl who had been rejected from membership as a cub scout. *Id.* at 329. In that case, we reviewed the legislative history of *former* ORS 30.675 (1975), *renumbered as* ORS 659A.400 (2001), to discern whether the Boy Scouts qualified as a place of public accommodation. *Id.* at 331-34. We concluded that the legislative history made clear that the "primary concern and purpose of the Oregon legislature *** was to prohibit discrimination by *business or commercial enterprises* which offer goods or services to the public," such that the definition of a place of public accommodation should not be understood to extend to a noncommercial organization like the Boy Scouts. *Id.* at 334 (emphasis in original). We located that limitation in the phrase "place or service," having concluded that those were "general terms and the intended meaning of such words in any given context may depend upon the intent with which such words were used." *Id.* at 331. That specific holding is of little relevance here, however, because defendant is a commercial entity, and it does not dispute that it provides services.[5] However, it is notable that we did not decide the case on the grounds that the Boy Scouts did not offer services to the public, even though the services that it was alleged to provide, "scouting services and programs," were restricted not only by sex but also by age. *Id.* at 329. Indeed, we acknowledged that, notwithstanding its noncommercial nature, the Boy Scouts might not qualify as a "bona fide club or place of accommodation which is in its nature distinctly private." *Id.* at 335.

As in *Schwenk*, we resolve the textual ambiguity before us by turning to the legislative history of ORS

---

[5] The dissent argues that the legislature would not have wanted Oregon's antidiscrimination laws to "apply in the context of jails and prisons" because jails and prisons are not business or commercial enterprises. 369 Or at 760-61 (Garrett, J., dissenting). But defendant *is* a commercial enterprise, and it does not escape that status by contracting with an organization or government body that is not commercial in nature. Along the same lines, we fail to understand the dissent's claim that jails "exist to *separate* their populations from the ordinary commercial life to which public accommodations laws have always been addressed." *Id.* (emphasis in original). Of course, if those in the custody of the Clackamas County Jail were completely isolated from service-providing commercial entities, they would neither receive nor require the protections conferred by ORS 659A.400(1)(a). It is precisely because commercial enterprises like defendant *are* present in the Clackamas County Jail that ORS 659A.400(1)(a) is implicated here.

659A.400. What is now ORS 659A.400 originated in 1953 as part of a bill forbidding discrimination in any "place of public accommodation, resort, or amusement \*\*\* on account of race, religion, color, or national origin." Or Laws 1953, ch 495, § 1; *see also Schwenk*, 275 Or at 331-32 (discussing that history). As first enacted, a "place of public accommodation, resort, or amusement" was defined to mean

> "any hotel, motel or motor court, any place offering to the public food or drink for consumption on the premises, or any place offering to the public entertainment, recreation or amusement; provided that nothing contained in this Act shall be construed to include or apply to any institution, bona fide club or place of accommodation, resort or amusement, which is in its nature distinctly private."

Or Laws 1953, ch 495, § 2.

Subsequent amendments, however, substantially expanded that once-limited scope. First, in 1957, the legislature added additional categories of places of public accommodation—trailer parks and campgrounds—reorganizing the statute in the process:

> "(1)   A place of public accommodation, resort or amusement, subject to the exclusion in subsection (2) of this section, means:
>
> "(a)   Any hotel, motel, motor court, trailer park or campground.
>
> "(b)   Any hotel offering to the public food or drink for consumption on the premises.
>
> "(c)   Any place offering to the public entertainment, recreation or amusement.
>
> "(2)   However, a place of public accommodation, resort or amusement does not include any institution, bona fide club or place of accommodation, resort or amusement, which is in its nature distinctly private."

Or Laws 1957, ch 724, § 1.

A more significant expansion occurred four years later, in 1961. Senate Bill (SB) 75 (1961) made two changes to that statutory wording. First, it amended *former* ORS 30.675(1)(b) (1955) to include hotels "offering to the public

food or drink for consumption on *or off* the premises." Or Laws 1961, ch 247, § 1 (emphasis added). Second, and more importantly, it added a catchall provision to the end of subsection (1), defining place of public accommodation, amusement, or resort to include "[a]ny place offering to the public goods or services." Or Laws 1961, ch 247, § 1.

The legislative history of SB 75 shows that that expansion was the result of concerns about racial discrimination in a variety of areas, including "health and beauty salons, barber shops and medical services." *Schwenk*, 275 Or at 333; *see also* Testimony, Senate Committee on State and Federal Affairs, SB 75, Feb 9, 1961, Ex 4 (statement of Joint Council for Social Welfare Legislation) ("This amendment to the Public Accommodations Law would cover such places as barber shops, beauty parlors, health studios, physicians and the like."). Although much of the testimony focused on specific types of services where discrimination was common, the legislature adopted a broader solution, extending Oregon's public accommodations laws to encompass all goods and services that were provided to the public.

Much of the debate over SB 75, including the examples of services that would be covered, cuts against defendant's contention that services offered to the public were limited to services that were offered on "an indiscriminate or unscreened basis." For example, a substantial amount of the testimony in support of the bill focused on discrimination by weight loss services and beauty salons that appeared to exclusively serve women but that discriminated within that clientele on the basis of race. *See* Cover Letter and Testimony, Senate Committee on State and Federal Affairs, SB 75, Feb 9, 1961, Ex 7 (statement of Harry C. Ward, President of the Portland Branch of the NAACP) ("Complaints have come particularly from women who sought slenderizing services from Marie Easterly \*\*\* and Slenderella (a nationally known chain). Some of our larger places do accept minorities for ladies hair styling but there are also firms that do not."); Testimony, Senate Committee on State and Federal Affairs, SB 75, Feb 9, 1961, Ex 2 (statement of E. Shelton Hill, Executive Director of the Urban League of Portland) (reporting racial discrimination by "Health Studies and Reducing Salons" that served women).

There was no suggestion that, because those businesses did not serve the *entire* public—and would not do so even if they ceased discriminating on the basis of race—they would not be covered by the text of SB 75.

The legislature next amended the definition of place of public accommodation in 1973, as part of House Bill (HB) 2116 (1973), the bill that expanded Oregon's bar on discrimination in places of public accommodation to include discrimination on the basis of sex and marital status. Or Laws 1973, ch 714, §§ 2, 8. As a result of that amendment, *former* ORS 30.675 (1973) defined a place of public accommodation to mean, "subject to the exclusion in subsection (2)," "any place or service offering to the public accommodations, advantages, facilities or privileges whether in the nature of goods, services, lodgings, amusements or otherwise." *Former* ORS 30.675(1) (1973). Subsection (2), which was not meaningfully changed, continued to exclude "any institution, bona fide club or place of accommodation which is in its nature distinctly private." *Former* ORS 30.675(2) (1973). The 1973 amendment simplified the definition by expanding the catchall provision to include "accommodations, advantages, facilities or privileges whether in the nature of goods, services, lodgings, amusements or otherwise," rather than just services, and eliminating the listed places of public accommodation, which were now redundant (and which perhaps had been redundant since the addition of the catchall provision in 1961). As a result, there was now a single definition of a place of public accommodation accompanied by a single exclusion.

As was the case with SB 75 (1961), HB 2116 (1973) addressed discrimination broadly, but its advocates focused on particular areas in which discrimination was particularly prevalent or harmful. One of the areas where sex and marital status discrimination was particularly prevalent, and which HB 2116 was intended to address, was the availability of credit. Exhibit 7, House Committee on State and Federal Affairs, HB 2116, Mar 2, 1973 (statement of Neil Robblee) ("Almost one-third of the mortgage lenders in the Portland area require statements certifying the wife's sterility or her use of contraceptives before they will include her income in the loan. *** The reality behind this data is

that vast numbers of women in Oregon have been denied credit because of their sex."); Exhibit 1, House Committee on State and Federal Affairs, HB 2116, Mar 2, 1973 (statement of Eleanor M. Meyers) ("The Bureau of Labor has heard from citizens about experiences indicating discrimination because of one's sex exists in some restaurant facilities, some hotel and motel rental practices, some practices in the sale of business services, and a large number of experiences relating to the granting of credit services."). In passing HB 2116, the legislature understood that the definition of place of public accommodation was an expansive one and that it would cover credit-related services, as well as many other businesses:

> "With the exception of governmental services and those of distinctly private institutions, the terms of the statutes on discrimination in public accommodations are quite comprehensive. The language used in guaranteeing 'full and equal accommodations, advantages, facilities and privileges without distinction or restriction' and including in the definition of a public accommodation 'any place offering to the public goods and services' would include literally all phases of any business soliciting public patronage, including the service of granting the use of credit, and financing and loan services which is one of the most widespread areas of discrimination based on sex."

Exhibit 1, House Committee on State and Federal Affairs, HB 2116, Mar 2, 1973 (statement of Eleanor M. Meyers); *see also Schwenk*, 275 Or at 334 (discussing the purpose of HB 2116).

That legislative history again contradicts defendant's contention that a service must be offered on "an indiscriminate or unscreened basis" to qualify as a place of public accommodation. The credit and loan services that the legislature clearly intended to cover necessarily would frequently involve some degree, and possibly a great degree, of screening and selectivity, but the legislature did not understand that to keep them from being places of public accommodation.

ORS 659A.400 was amended most recently in 2013. One of the amendments added the word "transportation" to

the list of "accommodations, advantages, facilities or privileges" covered by the definition. Or Laws 2013, ch 530, § 4. The other, more substantial, change added two additional categories of public accommodations:

"(b)  Any place that is open to the public and owned or maintained by a public body, as defined in ORS 174.109, regardless of whether the place is commercial in nature.

"(c)  Any service to the public that is provided by a public body, as defined in ORS 174.109, regardless of whether the service is commercial in nature."

Or Laws 2013, ch 429, § 1. That amendment also added four new categories of exclusions, including the exclusion for local correction facilities. Or Laws 2013, ch 429, § 1. However, that bill did not amend ORS 659A.400(1)(a), the definition at issue here, so—although we address it below, in the process of interpreting ORS 659A.400(2)(d)—it is of limited relevance to the specific question before us.

The legislative history therefore shows us that adopting defendant's rule—that, to be offered to the public, a service must be offered on an "indiscriminate or unscreened basis"—would exclude classes of services that the legislature clearly intended to cover as places of public accommodation. That provides a strong indication that the fact that a service is limited to a subset of the public is, at least under some circumstances, compatible with that service being offered to the public within the meaning of ORS 659A.400(1)(a). However, that fact alone does not resolve how broadly that principle extends or help us discern when a service is offered too restrictively to count as being provided "to the public."

The legislative history also highlights that, at the point at which the current phrasing of ORS 659A.400(1)(a) was solidified—through the 1961 and 1973 amendments—that provision was placed in opposition to what was at those times the only exclusion, the exception for "[a]n institution, bona fide club or place of accommodation that is in its nature distinctly private." Although the legislative history summarized above provides evidence of the types of services that the legislature wished to include, the retention of the exception and its juxtaposition with the catchall definition provides the clearest evidence of the types of services that the

legislature wished to exclude: services that are distinctly private in nature and that are not offered even to a defined segment of the public. We understand, in context, that the "to the public" requirement does not limit public accommodations only to services offered to the *entire* public. Rather, that requirement is intended to draw a distinction between services offered broadly, even with some significant restrictions, and services provided on a distinctly private basis.[6] We think that understanding is most compatible with the legislature's clear intention that ORS 659A.400(1)(a) apply even when the service is selectively offered to a segment of the public.

Moving somewhat beyond its assertion that a service must be offered on an entirely unscreened basis, defendant's briefing acknowledges that, under its understanding of ORS 659A.400, a service need not be offered "to every member of the general public without limitation" to qualify as a public accommodation. As an example of an organization that serves only a subset of the general public yet still qualifies as a place of public accommodation, defendant cites *Tillman v. Wheaton-Haven Recreation Ass'n, Inc.*, 410 US 431, 93 S Ct 1090, 35 L Ed 2d 403 (1973), a case in which the United States Supreme Court held that a club—with a 325-family membership limit, mostly restricted to residents within a three-quarter-mile radius of the club's location— did not qualify for the private club exception to Title II of the Civil Rights Act of 1964. *See* 42 USC § 2000a(e) ("The provisions of this subchapter shall not apply to a private club or other establishment not in fact open to the public, except to the extent that the facilities of such establishment are made available to the customers or patrons of an establishment within the scope of subsection (b)."). There, the Court reasoned that, because the club's membership was open to every white resident in a given geographic area, it did not qualify as a private club. *Tillman*, 410 US at 438. Defendant accepts that such an institution would qualify as a place of public accommodation under ORS 659A.400(1)(a).

---

[6] Organizations that are not commercial in nature may fail to qualify as a place of public accommodation even if they are not distinctly private. *Schwenk*, 275 Or at 335. But that is because they may not offer a place or service, within the meaning of ORS 659A.400(1)(a), *at all*.

But that example does not help defendant, for defendant offers no clear distinction between the types of qualifications that defendant regards as being consistent with a service being offered to the public—such as a limitation to residents within a small geographical area—and the sole qualification attendant to the services offered by defendant— that the recipient be at least temporarily in custody in the Clackamas County Jail. In both of those scenarios, the services are not offered to every member of the public, and may in fact be offered only to a small subset of the general public, but they lack the element of selectivity necessary to qualify as distinctly private. *Accord Lahmann v. Grand Aerie of Fraternal Order of Eagles*, 180 Or App 420, 434, 43 P3d 1130, *rev den*, 334 Or 631 (2002) ("[W]hether an organization is a place of public accommodation turns on (1) whether it is a business or commercial enterprise and (2) whether its membership policies are so unselective that the organization can fairly be said to offer its services to the public.").

Here, although defendant limits its services to people who are in custody in the Clackamas County Jail, defendant does not, at least as alleged in the complaint, impose any additional selective criteria. And, although a jail may be restrictive in whom it houses, it also is not selective in the way that a club or other distinctly private organization is, such that defendant's provision of its services only to residents of the jail could cause defendant to fall within the "distinctly private" exception in ORS 659A.400(2)(e). We therefore conclude that it offers those services to the public within the meaning of ORS 659A.400(1)(a). Although defendant does not serve the public at large, and offers its services in a restricted environment, that does not diminish the legislature's expressed interest in ensuring that the services that defendant does provide are provided on a nondiscriminatory basis.

Finally, we address defendant's argument that, even if it satisfies the general definition of a public accommodation in ORS 659A.400(1)(a), it is nevertheless excluded from being considered a place of public accommodation by ORS 659A.400(2)(d). ORS 659A.400(2) provides:

"A place of public accommodation does not include:

"(a)   A Department of Corrections institution as defined in ORS 421.005.

"(b)   A state hospital as defined in ORS 162.135.

"(c)   A youth correction facility as defined in ORS 420.005.

"(d)   A local correction facility or lockup as defined in ORS 169.005.

"(e)   An institution, bona fide club or place of accommodation that is in its nature distinctly private."

A "local correctional facility" is defined by ORS 169.005(4) as "a jail or prison for the reception and confinement of prisoners that is provided, maintained and operated by a county or city and holds persons for more than 36 hours."[7]

The difficulty with defendant's reliance on the exclusion contained in ORS 659A.400(2)(d) is that defendant does not meet the statutory definition of a "local correction facility." Defendant is not a "jail or prison" and, even if it were, it is not "provided, maintained and operated by a county or city." ORS 169.005(4). As written, the exclusion contained in ORS 659A.400(2)(d) does not extend to private commercial entities that provide services *at* a local correction facility; it excludes the local correction facility itself from the definition of a place of public accommodation.

We understand defendant to interpret ORS 659A.400 (2)(d) as establishing a physical place where Oregon's public accommodations laws do not apply, rather than setting out entities exempted from those laws. That is, defendant advocates for understanding ORS 659A.400(2)(d) to exclude from the definition of a place of public accommodation not only the jail itself, but also any other entity that operates within that physical location. According to defendant, "[m]edical services for prisoners at a jail delivered by a private healthcare provider fit within that express statutory exclusion because, regardless of the nature of the service provider, services *at*

---

[7] A "lockup" is defined as "a facility for the temporary detention of arrested persons held up to 36 hours, excluding holidays, Saturdays and Sundays, but the period in lockup shall not exceed 96 hours after booking." ORS 169.005(5).

a jail are not provided at a 'place of public accommodation' under ORS 659A.400." (Emphasis added.)

The dissent also seems to argue that the exemption applies not only to services provided *by* a jail but also to services that are provided *at* a jail. Although the dissent seems to agree with the majority that the legislature did not intend to exempt local correctional facilities as buildings, 369 Or at 765-66 (Garrett, J., dissenting), it cites the dictionary definition of "facility" and argues that the legislature intended to exempt "the building *and* the services *provided within it*, at least those services, including the delivery of food and medical care, that are inseparable from the function of confining people for long periods of time." *Id.* (Garrett, J., dissenting) (first emphasis in original; second emphasis added) (footnote omitted).

The problem with both arguments is that we are not free to substitute the dictionary definition of a term for a definition that the legislature has expressly directed us to use—here, the definition of "local correctional facility" contained in ORS 169.005(4). *See Patton v. Target Corp.*, 349 Or 230, 239, 242 P3d 611 (2010) ("[T]he legislature is free to define words to mean anything that it intends them to mean, including defining words in a manner that varies from a dictionary definition or common understanding." (Internal quotation marks omitted.)); *see also* Jack L. Landau, *Oregon Statutory Construction*, 97 Or L Rev 583, 651 (2019) ("If the legislature defines a term, then that's what it means. Period."). Both the argument of defendant and the argument of the dissent are poor fits for the actual wording of the statute.

Under current law, a place of public accommodation need not be a physical place at all—that term is defined to include "[a]ny place *or service* offering to the public accommodations, advantages, facilities or privileges whether in the nature of goods, services, lodgings, amusements, transportation or otherwise." ORS 659A.400(1)(a) (emphasis added). If defendant qualifies as a place of public accommodation because of the services that it provides, it does not matter whether it provides those services *at* a physical location that independently qualifies as a place of public accommodation.

Likewise, ORS 659A.400(1)(c) defines a place of public
accommodation to include "[a]ny service to the public that is
provided by a public body, as defined in ORS 174.109, regard-
less of whether the service is commercial in nature"—again,
without reference to where that service is provided. As a
result, excluding a local correction facility from the defini-
tion of a place of public accommodation does not imply that
service providers like defendant are exempted as well. When
ORS 659A.400(2) states that "[a] place of public accommo-
dation does not include," among other things, "[a] local cor-
rection facility or lockup as defined in ORS 169.005," the
most straightforward reading is that it simply prevents a
local correction facility from being considered a place of pub-
lic accommodation—there is no textual basis for inferring
additional exclusions for private entities that operate in the
same space.

　　　Indeed, during discussion of the bill that created
ORS 659A.400(2)(d), the legislature recognized that there
would necessarily be some situations where two entities
that share the same physical space have different duties
under Oregon's antidiscrimination laws because only one of
those entities qualifies as a place of public accommodation.
A Bureau of Labor and Industries representative gave an
example of such a divergence at a hearing on the bill:

> "The issue came up in the House about what happens if a
> church rents from a school gym and that church may or
> may not be open to, say, gay members. The school's antidis-
> crimination policy would not inure to the renter. In other
> words, the school's only responsibility would be to say not
> to discriminate in to whom they rent. So if they rent to
> a Methodist church they're [going to] have to rent to an
> Episcopal church as well."

Audio Recording, Senate Committee on Judiciary, HB 2668,
May 9, 2013, at 18:00 (statement of Elizabeth Cushwa),
https://olis.oregonlegislature.gov (accessed May 24, 2022).
That shows that, as understood by the legislature that
enacted ORS 659A.400(2)(d), it would not be unusual for
Oregon's civil rights laws to impose different obligations
on different users of the same space, as when a private
group qualifying for the exception in ORS 659A.400(2)(e)

rents space at a hotel or public building. We see no reason to assume that the exception in ORS 659A.400(2)(d) would operate differently.

Two additional aspects of the legislative history of ORS 659A.400(2)(d) cut against defendant's reading. The first is that the exception for local correctional facilities was enacted as part of a bill that extended the definition of place of public accommodation to cover public agencies. As initially conceived, the bill would have extended the definition of "place of public accommodation" in ORS 659A.400(1) to cover public bodies without creating any new exceptions. Representatives of the Oregon Department of Corrections and the Oregon State Sheriffs' Association opposed that approach, arguing that concerns particular to the corrections setting justified an exemption. Audio Recording, Senate Committee on Judiciary, HB 2668, May 9, 2013, at 22:58 (statement of Darrell Fuller), https://olis.oregonlegislature.gov (accessed May 24, 2022). The bill was subsequently amended to create the exceptions for local correction facilities, prisons, state hospitals, and juvenile detention facilities set out in ORS 659A.400(2). *See* HB 2668 (2013), -3 amendments (May 29, 2013). In that context, it makes sense to understand the exceptions that were added as designed to exempt the public entities that would otherwise be covered by the expanded scope of ORS 659A.400(1), and to exempt them as public entities, rather than as physical locations. It also makes sense to understand the legislature as focusing on the public entities that it intended to exempt rather than on private companies that would not have been affected by the amendments to ORS 659A.400(1).

Second, the representative of the Oregon State Sheriffs' Association who proposed the amendment justified it based on two concerns. The first was that expanding coverage to jails and prisons might "open[ ] up BOLI to a whole lot of complaints that they maybe don't want to have to handle" because of "inmates who that's kind of what they consider their job to be as an inmate is to file grievances all the time." Audio Recording, Senate Committee on Judiciary, HB 2668, May 9, 2013, at 23:44 (statement of Darrell Fuller), https://olis.oregonlegislature.gov (accessed May 24, 2022). The

second was that there would be "circumstances where some of what we do could be perceived as a violation or could be turned into a complaint that we're violating somebody's civil rights based on public accommodations simply because we're trying to keep the jail inmates from having conflicts," giving the example of putting an inmate in a single cell "because of their sexual orientation or perceived sexual orientation" for the person's own protection. *Id.* at 24:40. Although the first concern could be applicable to other entities providing services inside a prison, there is no indication that the representative of the Oregon State Sheriffs' Association was concerned about claims involving only private companies, rather than complaints against prisons or jails themselves. And the second concern speaks more specifically to security concerns that a prison or jail must manage; it does not indicate an interest in excepting private service providers from antidiscrimination laws. As a result, the specific reasons offered for the exception are consistent with it being intended to except local correction facilities as entities, rather than as physical locations.[8]

When we focus, as we must, on the legislature's definition of a "local correction facility" as "a jail or prison," we cannot conclude that defendant—a private entity that contracts with a jail, but that is not a jail—is exempt from the provisions of the Act. Based on the text of ORS 659A.400(2)(d), as well as its legislative history, we conclude that defendant does not qualify as a local correction facility.

## CONCLUSION

We answer the Ninth Circuit's certified question as follows: A private contractor providing healthcare services at a county jail is a "place of public accommodation" within the meaning of ORS 659A.400 and can be subject to liability under ORS 659A.142.

---

[8] We have not been asked to consider circumstances in which a private contractor violated ORS 659A.142 at the direction of a jail or in which the contractor's actions might otherwise be attributable to the jail itself. Defendant's only claim to the coverage of ORS 659A.400(2)(d), at least at this stage of the case, is based on the categorical, location-based argument laid out above, which we reject. And our holding is limited to private contractors like defendant; we do not address the hypothetical scenarios involving other county agencies posited by the dissent. 369 Or at 764-65 (Garrett, J., dissenting).

The certified question is answered.

**GARRETT, J.,** dissenting.

The majority's conclusion in this case would proba-bly surprise the drafters of Oregon's public accommodations law (the "Act"), who likely had no intention to regulate activ-ities within a jail. It would certainly surprise the drafters of the 2013 amendments to the Act, who intended to remove any doubt by expressly excluding correctional facilities from the definition of a "place of public accommodation." Like the federal district courts that considered this question before us, and consistently with how courts around the country have construed similar state laws, I would conclude that the Act does not apply in this context. I respectfully dissent.

In its current form, ORS 659A.400(1)(a) defines a "place of public accommodation," as relevant here, to mean "[a]ny place or service offering to the public accommodations, advantages, facilities or privileges whether in the nature of goods, services, lodgings, amusements, transportation or otherwise." That definition has changed several times since the Act was first enacted in 1953. *See* Or Laws 1953, ch 495, § 1. This court discussed the history of the Act in *Schwenk v. Boy Scouts of America*, 275 Or 327, 331-34, 551 P2d 465 (1976), where we noted that the original definition included "any hotel, motel or motor court, any place offering to the public food or drink for consumption on the premises, or any place offering to the public entertainment, recreation or amusement." *Id.* at 332 (citing Or Laws 1953, ch 495, § 2). We further concluded from the legislative history that "the intended purpose of the bill was to prevent 'operators and owners of *businesses* catering to the general public to subject Negroes to oppression and humiliation [] ***.'" *Id.* (quoting Testimony, House Committee on State and Federal Affairs, SB 169, Apr 7, 1953, Ex 1 (written statement of Ulysses G. Plummer, Jr.) (emphasis in *Schwenk*)).

As the majority notes, the amendments to the defi-nition of "place of public accommodation" over time have broadened the types of establishments, goods, and services that come within its scope. 369 Or at 747-48. At no time, however, has the legislature indicated an intention to depart

from the animating premise that a place of public accommodation is one "catering to the general public." *Id*.

The concept of "catering to the general public," or soliciting business from the public at large, does not mean that a place of public accommodation must seek to cater to everyone. A place of public accommodation may be one that effectively serves only a subset of "the public," perhaps because it provides a good or service that only certain people want, or perhaps because of eligibility criteria that effectively screen out some people (such as dress code requirements, admissions fees, or creditworthiness criteria), so long as those criteria are not so subjective and selective that they convert the business into a place that is "in its nature distinctly private." ORS 659A.400(2)(e).

The majority opinion expends much energy proving that point, but it is not really disputed in this case. Defendant has directed us to the relevant cases, including those holding that a place of public accommodation can be one that in reality serves only a subset of the "public," and defendant does not ask us to adopt a different principle. Rather, as I understand defendant's argument, the reason that the Act is inapplicable here is not because inmates in a prison or a jail cannot be considered members of "the public" in some sense, but because a correctional facility simply is not one where anything is "offer[ed] to the public" in the sense contemplated *by the Act*, as we construed it in *Schwenk*. See *Schwenk*, 275 Or at 332-33.

That argument is persuasive. The services provided within a prison may be "offered" in the literal sense of that word, and the recipients may be members of "the public" under some literal uses of that word. Yet the phrase "offering to the public," within the unique context of the Act, has an evident historical meaning that is not captured by parsing the phrase into its component words, finding some literal meanings, and adding them back together. The Act, like others of its kind, was meant to codify a rule with common-law roots: that people should be free from discrimination in places that the community at large may, in principle, choose to patronize in the course of day-to-day commercial and social life.

*See, e.g.*, *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 US 557, 571, 115 S Ct 2338, 132 L Ed 2d 487 (1995) ("At common law, innkeepers, smiths, and others who 'made profession of a public employment,' were prohibited from refusing, without good reason, to serve a customer." (Quoting *Lane v. Cotton*, 88 Eng Rep 1458, 1465 (KB 1701).)). As we explained in *Schwenk*, the Act was passed "to prohibit discrimination by *business or commercial enterprises* which offer goods or services to the public." 275 Or at 334 (emphasis in original). Not until the 2013 amendments, discussed below, did the Act extend beyond that "commercial" focus. Thus, it is unlikely that the drafters of the pre-2013 versions of the Act imagined that it would apply in the context of jails and prisons, which by their nature *exclude* the public at large and exist to *separate* their populations from the ordinary commercial life to which public accommodations laws have always been addressed.

For those reasons, numerous other courts have concluded that state public accommodations laws do not apply in this context. *E.g.*, *State ex rel Naugles v. Mo. Comm'n on Hum. Rts., B.A.*, 561 SW3d 48, 54 (Mo Ct App 2018) ("If anything, [jails and prisons] are properly viewed as *the antithesis* of a 'place of public accommodation.'" (Emphasis in original.)); *Skaff v. W. Va. Hum. Rts. Comm'n*, 191 W Va 161, 163-64, 444 SE2d 39, 41-42 (1994) ("[B]ecause members of the general public are excluded, the inmates' place of confinement cannot be deemed a public accommodation."); *Blizzard v. Floyd*, 149 Pa Commw Ct 503, 506-07, 613 A2d 619, 621 (1992) ("[S]ince the purpose of a correctional institution is to incarcerate persons convicted of crime or awaiting trial or sentence, inmates do not enjoy the privilege of leaving the facility at will. It is therefore clear that a state correctional institution is not a public accommodation as defined by the Act.").

Thus, even before 2013, the answer to the question posed by this case should have been that the Act does not apply. Any doubt, however, is removed by the 2013 amendments. *See* Or Laws 2013, ch 429, § 1. As the majority notes, the legislature amended the Act in several ways, including by adding two new categories to the definition of "place of

public accommodation." 369 Or at 750-51. Those categories are now codified in ORS 659A.400(1)(b) and (c) of the Act:

"(b)   Any place that is open to the public and owned or maintained by a public body, as defined in ORS 174.109, regardless of whether the place is commercial in nature.

"(c)   Any service to the public that is provided by a public body, as defined in ORS 174.109, regardless of whether the service is commercial in nature."

Those provisions for the first time moved the Act away from its focus on business and commercial activity by extending the nondiscrimination requirements to certain public places and services "regardless of whether [the place or the service] is commercial in nature." ORS 659A.400(1)(b), (c).

In the course of considering those amendments, the legislature was asked to, and did, clarify that the expansion of the Act would *not* extend to correctional facilities. It did so by adding the following exceptions in ORS 659A.400(2):

"A place of public accommodation does not include:

"(a)   A Department of Corrections institution as defined in ORS 421.005.

"(b)   A state hospital as defined in ORS 162.135.

"(c)   A youth correction facility as defined in ORS 420.005.

"(d)   A local correction facility or lockup as defined in ORS 169.005."

Or Laws 2013, ch 429, § 1. The legislative committee heard some discussion of whether, even without the proposed amendments, correctional facilities were excluded from the definition of a place of public accommodation. A representative of the Bureau of Labor and Industries (BOLI) testified as follows:

"First, are prisons places of public accommodation? Maybe and maybe not. Those people who are detained or housed in these facilities are not free to leave and to come and to go and no one can choose to join them without committing a crime for which they're convicted. However, these facilities also give tours and have visiting hours open to the public. So, should they not be held to the same

antidiscrimination standards treating all *visitors* in a non-discriminatory way? BOLI would say yes. Should compliance with civil rights and antidiscrimination laws cause a huge risk to them? No. Agencies providing services using federal dollars are generally subject to antidiscrimination laws now. This wouldn't change that.

"As to the inmates, there are also a couple of ways of looking at this. Either they are not a place of public accommodation and open to the public and therefore wouldn't have any recourse, or, due to the fact that prison industries have a commercial nature, they would already be covered under current statute, but BOLI has never received a claim for any of these under this statute."

Audio Recording, Senate Committee on Judiciary, HB 2668, May 9, 2013, at 19:01 (statement of Elizabeth Cushwa (emphasis added)), https://olis.oregonlegislature.gov (accessed May 24, 2022). Thus, it appears that, as of 2013, no one had argued that the performance of core operations within a prison or jail could be the subject of a public accommodations claim.

Nonetheless, acknowledging the potential uncertainty on that point, law enforcement representatives explained the need for amendments to clarify that the Act does not apply to correctional facilities. The lead proponent, the representative for the Oregon State Sheriffs' Association, testified as follows:

"There are also times where we take actions in order to protect an inmate that they might be able to turn around and suggest that we're violating their civil rights. For example, if we take an inmate, and because of their sexual orientation, or perceived sexual orientation, we put them into a cell by themselves, as opposed to putting them in a cell where everybody else is two to a cell, we put them in a cell by themselves for their own protection. Are we then violating their civil rights, and would we be prohibited from doing that?

"So, there are circumstances where some of what we do could be perceived as a violation, or could be turned into a complaint that we're violating somebody's civil rights based on public accommodations, simply because we're trying to keep the jail inmates from having conflicts. And so, as BOLI

testified, we're not sure what is and isn't in or out when it comes to public accommodations, we certainly would all agree that tours and access to inmates for visitation would be a public accommodation, but we are a little bit concerned about, when you get into the inmate population, whether they're included in that or not, and whether there ought to be some provision for allowing the corrections folks to do what we need to do to keep our jails safe."

Audio Recording, Senate Committee on Judiciary, HB 2668, May 9, 2013, at 24:40 (statement of Darrell Fuller), https://olis.oregonlegislature.gov (accessed May 24, 2022).

In short, the 2013 amendments were adopted to make clear that state and local correctional facilities are not "place[s] of public accommodation," in recognition that correctional facilities have unique characteristics and needs that are incompatible with the requirements of the Act. As was explained to the legislature (with no disagreement), managing those institutions to promote the safety and well-being of incarcerated persons and staff may sometimes require segregation, isolation, or other treatment of persons for reasons that would be unacceptable outside prison walls.

With that purpose in mind, it is difficult to see how the majority's analysis is consistent with legislative intent. It is beyond dispute that the exception for correctional facilities was enacted because of the nature of those *environments*, yet the majority approaches this case as if what matters is not the environment in which the medical services are being provided, but *by whom* they are being provided. In the majority's view, defendant provides a service (medical care) that, in the world at large, qualifies it as a place of public accommodation, and the exception for correctional facilities does not apply in this case because defendant is not a correctional facility—it is a contractor acting under an arrangement with Clackamas County, which owns the jail. 369 Or at 758. Under that analysis, if the Clackamas County Jail provides medical care, food, and other basic services directly, the exception for correctional facilities applies, but if the jail contracts with any other entity to provide those services, the exception does not apply to that entity. Although the majority purports to limit its holding to "private contractors," its logic contains no limiting principle that would protect other

*public* entities. Suppose the jail arranges to provide food services through a different county agency, or through another public body altogether, such as a state agency. Suppose the food services agency determines for safety reasons that it is necessary to segregate inmates in the cafeteria on the basis of, for example, sexual orientation. The majority's reasoning plainly raises the possibility that the food services agency will be exposed to liability under the Act because it is not the "local correction facility."

The record offers no indication that the legislature intended for the applicability of the exception to turn on contracting arrangements, which have nothing to do with the reason why correctional facilities were excluded. Again, the legislature adopted the amendment because a policy judgment that the nature of those environments, with the emphasis on conflict avoidance and "keep[ing] our jails safe," makes them a poor fit for the requirements and protections of the Act. That judgment would not have turned on whether a particular function is performed by the entity that owns the prison or by another entity under contract, and the majority identifies no plausible reason to think otherwise.[1] On the contrary, as the federal district court correctly observed, the concern that "coverage would hinder prison officials' ability to manage inmates safely" has equal force whether different jail services are "provided by the jail itself or by a private entity." *Abraham v. Corizon Health, Inc.*, No 16-cv-01877, 2017 WL 6061009 at *4 (D Or Sept 8, 2017), *adopted,* 2017 WL 6063066 (D Or Dec 7, 2017), *vacated on other grounds*, 775 Fed Appx 301 (9th Cir 2019).[2]

Finally, to the extent the majority views this result as compelled by the text, I disagree. The majority reasons

---

[1] The majority misses the mark in suggesting that the concern expressed in the legislative history "speaks more specifically to security concerns that a prison or jail must manage; it does not indicate an interest in excepting private service providers from antidiscrimination laws." 369 Or at 758. What the majority overlooks is that it could very well *be* a contractor that must address "security concerns." And, as noted above, the majority's reasoning does not protect public entity contractors, either.

[2] Needless to say, construing the Act not to apply in this context would not deprive incarcerated individuals of all remedies for discriminatory treatment or deficient medical care. Other federal and state statutes, and state tort law, might be applicable. Plaintiff in this case alleged several such claims.

that "services" cannot be covered by the exclusion in ORS 659A.400(2)(d) because that provision merely "excludes the local correction facility itself from the definition of a place of public accommodation." 369 Or at 754. That analysis assumes that the provision of services is *not* encompassed by the term "local correction facility." But that assumption is unfounded in this context. Buildings do not discriminate; people do. Thus, in specifically carving out a "local correction facility" from the coverage of an antidiscrimination statute, the legislature could only have meant to refer to the performance of tasks, functions, and services within the facility walls. That is consistent with the ordinary meaning of "facility": "something (as a hospital, machinery, plumbing) that is built, constructed, installed, or established *to perform some particular function or to serve or facilitate some particular end.*" *Webster's Third New Int'l Dictionary* 812-13 (unabridged ed 2002) (emphasis added). Therefore, it is more natural to understand the exception for a "local correction facility" as applying to the building *and* the services provided within it, at least those services, including the delivery of food and medical care, that are inseparable from the function of confining people for long periods of time.[3]

Because I believe the majority has answered the certified question incorrectly, I respectfully dissent.

Balmer, J., joins in this dissenting opinion.

---

[3] It makes no difference that, as the majority points out, "local correctional facility" is specifically defined to mean a "jail or prison for the reception and confinement of prisoners that is provided, maintained and operated by a county or city." ORS 169.005(4). The purpose of that definition seems to be to distinguish facilities that are "local" from those that are not. Moreover, the reference to "reception and confinement of prisoners" *reinforces* the understanding of a "facility" as a building that exists "to perform some particular function." *Webster's* at 813. Thus, the point is the same: the performance of tasks and services intrinsic to the function of "confinement of prisoners" is sensibly encompassed within the meaning of "local correction facility" in ORS 659A.400(2)(d).